**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re:<br><br>GLENWOOD CAVERNS HOLDINGS LLC,<br><br>Debtor. | Case No. 26-13137-KHT<br>Chapter 11 |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

THIS MATTER comes before the Court on the *Combined Disclosure Statement and Plan of Reorganization Dated June 8, 2026* (docket #242), the *Amended and Restated Combined Disclosure Statement and Plan of Reorganization Dated June 8, 2026, as Modified August 11, 2026* (docket #411), and the *Second Amended and Restated Combined Disclosure Statement and Plan of Reorganization Dated June 8, 2026, as Modified August 21, 2026* (docket #457), filed by Debtor Glenwood Caverns Holdings LLC ("Debtor"); the *United States Trustee's Objection to Debtor's Disclosure Statement and Plan of Reorganization Dated June 8, 2026* (docket #355), filed on behalf of the United States Trustee (the "U.S. Trustee"); the *Objection to Confirmation of Chapter 11 Plan Dated June 8, 2026* (docket #358), filed by NOVA Casualty Company ("NOVA"); and the *Estifanos Creditors' Opposition to Final Approval of Combined Disclosure Statement and Objection to Confirmation of Chapter 11 Plan; Reservation of Rights* (docket #359), the *Estifanos Creditors' Supplemental Opposition to Confirmation of Amended Combined Disclosure Statement and Plan of Reorganization* (docket #448), and the *Estifanos Creditors' Objection to Second Amended Plan and Modified Litigation Trust Agreement* (docket #469), filed by Creditors Estifanos Dagne and Rahel Estifanos (the "Estifanos Creditors"). Following an evidentiary hearing, the Court took the matters under advisement. The Court is now prepared to rule, and hereby finds and concludes as follows:

## I. JURISDICTION AND VENUE

The Court has jurisdiction under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L) and (A). Venue is proper in this district under 28 U.S.C. § 1408.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Park.

In 1982, when Steve Beckley ("Mr. Beckley") was a student at the Colorado School of Mines, he read about the cave system in nearby Glenwood Springs, Colorado. He

became interested in forming a business to provide cave tours to the public, and he started calling the owner of land atop Iron Mountain to convince the landowner to lease the land and allow the development. In 1998, the landowner agreed. Mr. Beckley and his wife moved to Glenwood Springs and began to develop Glenwood Caverns Adventure Park (the "Park").[1]

The Park opened in 1999. Initially, it offered cave tours and bus rides to visit the caves. The Park later added attractions for visitors to enjoy while waiting for cave tours. In 2003, a gondola was added to provide easier access to the Park. The first amusement ride, the Alpine Coaster, opened in 2005, and several more followed.

Currently, the Park runs three cave tours, operates six amusement park rides, provides other family-friendly attractions such as a 4D theater and gemstone panning, and offers dining and shopping options for guests. The Park is the only mountaintop amusement park in the United States. It sits at 7,100 feet in elevation, is accessible only by gondola, and features 360-degree scenic views of the surrounding Rocky Mountains. Though the Park is open year-round, peak season typically runs from May through September. It employs up to 250 people in peak season and approximately 80 during the winter. Nancy Heard is the General Manager of the Park.

### B. The Hot Springs.

Iron Mountain Hot Springs (the "Hot Springs"), also located in Glenwood Springs, Colorado, is a set of geothermal pools overlooking the Colorado River and the Rocky Mountains. In 2014, Mr. Beckley (through an entity owned with his wife) and his business partner, Mogli Cooper (through an entity), formed Iron Mountain Hot Springs, LLC, to develop the Hot Springs. Mr. and Mrs. Beckley's entity owned 60%, and Ms. Cooper's entity owned 40%.

The Hot Springs opened in 2015. The business provides a hospitality and thermal wellness venue offering mineral water and freshwater fed pools, and it includes a café and gift shop. Its business is not as seasonal as that of the Park. It employs approximately 100 people year-round. Aaron McCallister is the General Manager of the Hot Springs.

### C. Off Road.

Off Road Capital Partners, LLC (together with its affiliates, "Off Road") is a sponsor and manager of private investment entities formed to pursue acquisitions of what Off

---

[1] As set forth in a *Limited Liability Company Operating Agreement of Glenwood Caverns Holdings, LLC*, the Park is a Delaware LLC. The LLC's name is Glenwood Caverns Holdings, LLC. Although its name contains the word "Holdings," it is the operating entity. It is the Debtor in this case. The Court will use "the Park" to identify the Debtor's operations before it filed its bankruptcy case, "the Debtor" to describe the Debtor's actions after filing its bankruptcy case, and then "the Park" to refer generally to the operations that would be sold to the Purchaser. Mr. Beckley and his wife initially owned the Park through entities Glenwood Tramway, LLC and POW, Inc.

Road considers distinctive and unusual businesses capable of providing differentiated returns to its investors.

### 1. The Hot Springs.

In March of 2020, funds associated with Off Road[2] purchased the ownership of the Hot Springs through a new entity, IMHS Holdco, LLC ("IMHS Holdco"). The parties planned to use the additional capital to fund projects including a higher-end pool expansion and welcome center plus a 100-room hotel and resort.

IMHS Holdco is managed by a six-member board of managers, comprised of Rob Kramer, Gideon King, Denis Reshetnev, Jeremy Bronfman, Jeff Klocke, and Mr. Beckley.

Following the acquisition, Mr. Beckley continued to operate and manage the Hot Springs via a services agreement with an initial term of 30 months.

### 2. The Park.

In December of 2020, funds associated with Off Road[3] purchased the ownership of the Park through a new entity, GCAP Holdco, LLC ("GCAP Holdco"), a Delaware LLC, which is the Park's sole member and manager. Mr. Beckley, through an entity, bought back 17.5% of the ownership of GCAP Holdco. The acquisition was structured as an Opportunity Zone transaction, with an additional $12 million of equity investment committed to fund capital projects including a new event center and a new mountaintop roller coaster.

GCAP Holdco is managed by a five-member board of managers. Off Road designees Rob Kramer, Gideon King, and Denis Reshetnev constitute three of the five members. The other two are Mr. Beckley and Jeff Klocke.

Mr. Beckley's role in the management and operations of the Park was formalized through a Services Agreement dated December 8, 2020 (the "Management Services Agreement"), by and among the Debtor, Mr. Beckley, and Mr. Beckley's entity, Glenwood Tramway. Under the Management Services Agreement, Glenwood Tramway agreed to be responsible for managing the Park's day-to-day operations.

---

[2] The funds associated with Off Road – OR IMHS One LLC, OR IMHS Two LLC, and OR IMHS Three LLC – collectively own a 100% indirect interest in the Hot Springs. OR IMHS One LLC and OR IMHS Three LLC, each managed by ORB IMHS LLC and structured to pursue the benefits of Qualified Opportunity Zone tax treatment, collectively own approximately 70% of the membership interests of IMHS Holdco, with OR IMHS Two LLC holding the remaining interests.

[3] The funds associated with Off Road – OR GCAP One LLC, OR GCAP Two LLC, Arctaris Opportunity Zone Fund 2019, LLC, and 4PF Rural COZ Fund III, LLC – collectively own an 82.5% indirect interest in the Park. Mr. Beckley owns a 17.5% indirect minority interest through Cavern Village.

### D. Agreements between the Park and the Hot Springs.

The Park shares Human Resources, Information Technology, Marketing, and other administrative staff (a total of five staff members) with the Hot Springs, pursuant to a Shared Services Agreement. The original Shared Services Agreement was entered into March 2022 and has evolved over the years. The agreement currently in effect is the Second Amended and Restated Shared Services Agreement dated as of February 8, 2024. The Park manages the payroll for the employees subject to the Shared Services Agreement, and the Hot Springs reimburses the Park for its share of the employees' compensation each billing cycle. The costs of the shared employees is split equally between the Park and the Hot Springs.

The Park and the Hot Springs have participated in some joint ticket sales, offering a Double Access package that provides guests the option to purchase tickets for discounted admission to both properties. The packages have varied over time. Because guests must choose their Hot Springs soak date and soak type, the package is sold online only through the Hot Springs webstore. Guests receive a confirmation email with separate tickets for each property. The Park and the Hot Springs do not have a formal agreement regarding the joint ticket sales, but revenue and reporting remain separated by property. The Park's accounting manager has direct access to the Hot Springs reporting to review and reconcile the allocated revenue monthly. The Hot Springs creates an invoice based on the Park's portion of revenue collected and transfers those funds to the Park, net of credit card fees and refunds.

In 2024, the Park acquired from the Colorado Department of Transportation certain property adjacent to the Park entrance, known as the "Cornerstone Property." The Cornerstone Property has a small office building and a parking lot. The Park leases a portion of the property to the Hot Springs. Pursuant to a Commercial Lease Agreement, the Hot Springs pays the Park $6,900 per month for office space, which includes regular office supplies. The Hot Springs also pays 50% of all the utilities and 50% of other office-related expenses, including but not limited to office supplies, cleaning supplies and office repairs and maintenance. These expenses average $3,000 per month and are reviewed annually by both parties. Pursuant to a Parking Lot Lease Agreement, the Hot Springs pays the Park $4,200 per month to lease parking spaces.

The Park participates in a group property insurance policy with the Hot Springs and other parties in which funds associated with Off Road hold an interest. The Park asserts economies of scale result in a lower premium for it and the other parties involved.

The Park and the Hot Springs share other office expenses, and each subsidizes housing for certain employees. Employee housing rents are paid from the employee as a payroll deduction. Each company pays the rent subsidy to assist its employee. If an employee housing unit is empty, the Park and the Hot Springs split the rent cost equally.

**E. 2021 Tragedy.**

In September 2021, the Estifanos family visited the Park. Their six-year-old daughter boarded a ride then known as the Haunted Mine Drop,[4] which included a 100-foot drop into an underground shaft. The ride's seatbelt was not properly fastened around the child, and when the ride started, the child fell to her death.

The Estifanos Creditors initiated a wrongful death lawsuit (the "State Court Lawsuit") against the Park in the Denver, Colorado District Court. The State Court Lawsuit was later transferred to the Garfield County, Colorado District Court (the "State Court"). The Park's general commercial liability carrier at the time of the accident, NOVA, assumed financial responsibility for the Park's defense in accordance with the terms of the applicable policy.

After a three-week trial in September 2025, the jury returned a verdict against the Park and the other defendants in the State Court Lawsuit, awarding the Estifanos Creditors $82,000,000 in noneconomic damages in the following proportions of fault: the Park, 49.95% ($40,959,000); two Park employees who had operated the ride, .09% and .01% ($73,800 and $8,200); and the ride manufacturer, 49.95% ($40,959,000). The jury also awarded $123,000,000 in punitive damages against the Park and $6,200 in punitive damages against one of the two Park employees who had operated the ride.

The damage award for noneconomic loss exceeded the then-applicable $250,000 statutory cap on noneconomic damages recoverable under the Wrongful Death Act, Colo. Rev. Stat. § 13-21-203(1)(a). The Wrongful Death Act provides an exception to the damages cap if "the wrongful act, neglect, or default causing death constitutes a felonious killing, as defined in section 15-11-803(1)(b), and as determined in the manner described in section 15-11-803(7), in which case there shall be no limitation on the damages for noneconomic loss or injury recoverable in such action." Colo. Rev. Stat. § 13-21-203(1)(a). By Order entered October 2, 2025 (the "Order on Felonious Killing"), the State Court found the acts leading to the death of the Estifanos Creditors' daughter were done recklessly, meeting the elements of felony manslaughter under Colo. Rev. Stat. § 18-3-104 and satisfying the felonious killing exception to the cap on damages. As to punitive damages, the State Court reduced the amount entered against the Park to the amount of its liability for actual damages, which was $40,959,000 plus prejudgment interest.

On November 21, 2025, the State Court issued a judgment (the "State Court Judgment") against the Park and its co-defendants, apportioning more than $116,000,000 of liability to the Park in compensatory damages, punitive damages, and prejudgment interest. The State Court Judgment exceeds applicable insurance policy limits.

The Park contends the State Court's Order on Felonious Killing improperly applied the applicable law, and the actual damages should be capped at $250,000. The Park has

[4] The ride has since been revamped to increase safety and renamed the Crystal Tower.

filed an appeal of the State Court Judgment, which is pending before the Colorado Court of Appeals (the "State Court Appeal").

In December 2025, the Park retained Paul D. Maniscalco ("Mr. Maniscalco") as Chief Restructuring Officer. For a period of time after entry of the State Court Judgment, the parties entered into standstill agreements, but the parties ultimately reached an impasse, and the standstill agreements expired.

**F. Bankruptcy Case.**

On February 9, 2026, Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code, with the stated goal of maintaining stability and operations in the short term while pursuing the State Court Appeal. Debtor chose Chapter 11 to preserve its ability to provide continued operations of the Park and continued employment to its employees. The case was originally filed in the United States Bankruptcy Court for the District of Delaware (the "Delaware Court") and assigned case number 26-10166 (LSS).

**1. Early Motions**

In connection with its bankruptcy filing, Debtor filed applications to employ professionals and certain Initial Relief Motions, including the following:

- An Application to Appoint Epiq Corporate Restructuring, LLC ("Epiq") as Claims and Noticing Agent (docket #3), granted on February 11, 2026 (docket #25);
- A Motion Authorizing the Use of Cash Collateral (docket #9), granted on a final basis on March 11, 2026 (docket #95);
- A Motion to Establish Procedures for Interim Compensation and Reimbursement of Expenses of Professionals (docket #44), granted on March 9, 2026 (docket # 72);
- An Application to Employ Brownstein Hyatt Farber Schreck, LLP ("BHFS") as bankruptcy counsel (docket #46), granted on March 9, 2026 (docket #77);
- A Motion Authorizing the Debtor to Retain and Employ Scidan Consulting Group, LLC [Mr. Maniscalco's company] to Provide a Chief Restructuring Officer and Other Personnel for the Debtor and Related Items (docket #48), granted on March 9, 2026 (docket #74); and
- An Application to Employ Hilco Corporate Finance, LLC ("Hilco") as investment banker to the Debtor (docket #108), granted on April 14, 2026 (docket #133).

Each of the above orders was entered by the Delaware Court while the case was pending there.

**2. Hilco**

Debtor retained Hilco as its investment banker on March 4, 2026, and Hilco immediately began working on Debtor's project (nicknamed the "Bronco Project"). Hilco set up a virtual data room containing substantial information regarding Debtor and its

operations, including financial information, contracts, legal documents, real estate information, maps, surveys, and additional information that would be helpful to a potential bidder.

On March 31, 2026, Hilco sent a “teaser” email to approximately 190 parties on a list Hilco prepared, based on its research and contacts. At least 32 parties responded by signing nondisclosure agreements, which allowed the parties to access the virtual data room. Almost all parties who signed the nondisclosure agreement actually accessed the data room. At least five parties visited the Park for additional due diligence.

For its work, Hilco agreed to be paid a monthly fee of $25,000, plus expenses, plus a transaction fee of $450,000 or 4.5% of the sale price, whichever was greater.

**3. Venue Transfer**

On April 30, 2026, on the motion of the Estifanos Creditors, the Delaware Court transferred venue of Debtor’s case to this Court. The case was assigned number 26-13137 KHT. All orders since that date have been entered by this Court.

**4. Bid Procedures Order**

On May 20, 2026, Debtor filed its *Debtor’s Motion for Entry of an Order (I) Approving Bidding Procedures for the Debtor’s Plan, (II) Authorizing Bid Protections and Authorizing the Debtor to Enter Into a Stalking Horse Agreement, (III) Scheduling an Auction and Related Dates Thereto, (IV) Approving Contract Assumption and Assignment Procedures, and (V) Granting Related Relief* (docket #199). Accompanying the Debtor’s Motion was a Local Rule 9013-1.1 notice (docket #200), which set a deadline for any objections to be filed. Objections were timely filed by the U.S. Trustee (docket #222) and the Estifanos Creditors (docket #223).

The U.S. Trustee objected to the deadlines proposed in the Debtor’s Motion, which set a July 7 date to object to confirmation of the not-yet-filed Chapter 11 Plan, a July 10 date for bidders to submit qualified bids, and a July 25 auction date. The U.S. Trustee argued the deadline to object to confirmation should be after the auction. The U.S. Trustee also objected to the Debtor’s proposal to pay the Stalking Horse Bidder a break-up fee of up to 3% of the sales price, noting that amount may not be appropriate if the Stalking Horse Bidder were an insider or Debtor’s secured lender. Finally, the U.S. Trustee requested clarification of the calculation of the overbid requirement.

The Estifanos Creditors’ Objection stated they did not object to a sale of the Park and did not object to the general auction procedure, but they did object to the rushed timing of the auction process and proposed sale. The Estifanos Creditors argued that media coverage during the State Court Lawsuit may have affected 2025 Park attendance, and the 2026 attendance numbers should be better. The Estifanos Creditors also argued the Park should be sold during the summer of 2027, which would give them more time to conduct discovery about Debtor’s financials and its value as a going concern. Finally, the

Estifanos Creditors argued the 3% breakup fee to the Stalking Horse Bidder would be inappropriate for an insider and should be capped for a non-insider.

The Court held a hearing on May 27, 2026 (docket #224), and for the reasons stated on the record, it approved the bidding procedures on a different timeline than that proposed in the Debtor's Motion. By Order entered that same day (the "Bid Procedures Order," docket #225), the Court set the following deadlines:

| Date | Event |
|---|---|
| June 8, 2026 | Debtor to designate Stalking Horse Bidder |
| June 8, 2026 | Debtor to file a combined Plan and Disclosure Statement |
| June 22, 2026 | Parties to object to Stalking Horse Bidder Designation |
| July 17, 2026 | Deadline to Submit Qualified Bids |
| July 24, 2026 | Auction (as necessary) |
| July 31, 2026 | Deadline to Object to Plan Confirmation |
| August 14, 2026 | Confirmation Hearing |

Bid Procedures Order at 3-4. The Court also held the Debtor would be allowed to offer the Stalking Horse Bidder a break-up fee and expense reimbursement not to exceed 3% of the purchase price if the Stalking Horse Bidder did not include an insider. If the Stalking Horse Bidder included an insider, that Stalking Horse Bidder would be entitled to reimbursement of actual, reasonable, documented out-of-pocket expenses, in an amount not to exceed $250,000. *Id.* at 6.

**5. Stalking Horse Bidder**

GVC Glenwood, LLC ("GVC"), a newly formed entity owned by Gondola Ventures ("Gondola"), an outdoor hospitality investment company (80%), and by Mr. Beckley (20%), submitted a bid early in the process and hoped to be selected as Stalking Horse Bidder.

Glenwood Mountain LLC ("Glenwood Mountain"), a newly formed entity owned and operated by Jeff Crivello, founder of TREW Capital Management and an experienced bankruptcy asset acquirer in the hospitality space, also submitted a bid. Glenwood Mountain's ownership did not include any insider.

Debtor selected Glenwood Mountain as the Stalking Horse Bidder. On June 8, 2026, Debtor timely filed its Notice of Designation of Stalking Horse Bidder (docket #243). Attached to the Notice was an Asset Purchase Agreement providing for the sale of substantially all of Debtor's assets to Glenwood Mountain. As defined in the Asset Purchase Agreement, the Purchase Price included $1 million cash, payment of cure costs, and assumption of specific liabilities including secured debt to be restructured by the plan, consisting of Debtor's secured debt to Community Banks of Colorado, a division of NBH Bank (the "Bank"), which was owed at least $12,712,184.37 on the Debtor's petition date. The Purchase Price was estimated to total $13.7 million. Closing was

conditioned on entry of a confirmation order transferring assets free and clear and finding the purchaser was good faith purchaser entitled to protection under § 363(m).

Debtor also filed its Notice of Assumption and Assignment of Executory Contracts and Unexpired Leases and Cure Amounts (docket #244) and its Chapter 11 Plan (docket #242).

**6. Auction**

Because Debtor had received two Qualified Bids,[5] one from Glenwood Mountain and one from GVC, an auction was conducted as set forth in the Bid Procedures Order. The auction was held July 24, 2026, at Debtor's counsel's office in Denver, Colorado, with virtual participation provided. Attending the auction were the two bidders; the Bank, through its representative and counsel; the Estifanos Creditors, through their counsel; Debtor, through Mr. Maniscalco and its counsel; and Hilco. A court reporter transcribed the auction, which transcript was admitted into evidence (Exhibit 14).

After thirteen rounds of bidding, the auction ended when the last qualified overbid was not countered. Debtor concluded GVC was the winning bidder, subject to approval of this Court. GVC's winning bid exceeded Glenwood Mountain's best and final offer by $100,000. Debtor estimates GVC's purchase price will total $14,786,000, which includes (1) assumption of the Bank's secured loan, estimated to have a balance of $12,086,000 at closing, (2) $2,700,000 in additional cash, and (3) assumption of the Cure Amounts detailed in the Assumption and Assignment Notice. GVC would purchase all of Debtor's assets with the exception of the Excluded Assets set forth in the Asset Purchase Agreement (docket #350), and GVC would assume the contracts set forth on the Disclosure Schedule attached to the Asset Purchase Agreement.

Debtor designated Glenwood Moutain as the Backup Bidder.

**7. Amended Plan**

Following the auction, Debtor filed its Amended and Restated Combined Disclosure Statement and Plan of Reorganization Dated June 8, 2026, as Modified August 11, 2026 (the "Plan," docket #411). The Plan addressed confirmation objections made by the U.S. Trustee (docket #355), adjusting the definition of Exculpated Claim and clarifying the Debtor releases were not to be construed as releasing third party direct claims. By the end of the confirmation hearing, Debtor had resolved the objections filed by the U.S. Trustee and by NOVA. Only the Estifanos Creditors' objections remained.

[5] The Court's Bid Procedures Order set forth specific requirements for the submission of a "Qualified Bid." Hilco assisted Debtor in reviewing bids to determine whether they were qualified. Two additional bids were submitted, but those bids were not determined to be Qualified Bids, and those bidders did not participate in the auction.

### 8. Discovery

Throughout the pendency of this bankruptcy case, the Estifanos Creditors pursued discovery, both formally[6] and informally, as documented in the discovery requests, discovery dispute reports, and hearings held before the Court,[7] as set forth below.

Debtor asserts it provided the Estifanos Creditors full access to its books and records. Debtor estimates it produced approximately 19,000 pages of documents, almost all of which were provided in April 2026. The Estifanos Creditors took depositions of Mr. Maniscalco, Park Human Resources Manager Eric Brotherson, Park General Manager Nancy Heard, and Hilco representative Sanjay Marken. The Estifanos Creditors were also provided full access to the data room maintained by Hilco, the confidential presentation Hilco provided to interested parties, and the list of parties Hilco contacted.

Non-Debtor affiliates including Off Road, GCAP Holdco, and the Hot Springs estimate they produced over 4,000 pages of documents to the Estifanos Creditors, including internal financial statements and all bank account information. The Estifanos Creditors took depositions of Rob Kramer and Denis Reshetnev, which depositions the Non-Debtor affiliates assert exceeded 15 hours. Hot Springs general manager Aaron McCallister was made available for deposition, an opportunity the Estifanos Creditors did not pursue.

The Estifanos Creditors deposed Mr. Beckley on July 1, 2026, which his counsel represented lasted from approximately 9:00 a.m. to 5:00 p.m. Mr. Beckley's examination continued on July 23, 2026, which his counsel represented lasted from 5:00 p.m. to 10:30 p.m. Counsel asserts between the two dates, Mr. Beckley was on the record for almost 9.5 hours. Mr. Beckley also responded to written requests for information. The Court denied the Estifanos Creditors' request for a third deposition of Mr. Beckley.

And, the Estifanos Creditors obtained discovery from the Purchaser. They took the deposition of Scott Nocas as an individual and as a Rule 30(b)(6) designee of GVC.[8] Allowing discovery of a prospective purchaser is extraordinary relief, but the Court allowed it in this case, given the Estifanos Creditors' allegations.

The Court finds the Estifanos Creditors have been given every reasonable opportunity to discover evidence supporting the arguments they made to this Court.

[6] By Order entered June 3, 2026 (docket #229), the Court authorized the Estifanos Creditors to take depositions of Off Road Partners, Off Road Capital Management, LLC, Off Road Capital Partners L.P., [GCAP] Holdco, LLC, Steve Beckley, Eric Brotherson, Nancy Heard, and [Aaron] McCallister, pursuant to Fed. R. Bankr. P 2004 and L.B.R. 2004-1.

[7] The Court takes judicial notice of its docket and proceedings in this case. The parties' assertions set forth in this section, made on the record in pleadings and at hearings before the Court, are presumed to be accurate representations of officers of the Court. The representations do not appear to be disputed. But, the Court does not make specific factual findings as to the number of documents produced and the hours of deposition time.

[8] See Order entered August 5, 2026 (docket #385).

Although the Court limited their ability to present evidence and argument related to the merits of Debtor's claims and causes of action, the Court did not limit their ability to present evidence and argument related to the bankruptcy filing, the marketing process, the bidding process, the asset sale, the value of the assets sold, or the good faith of the Debtor, Mr. Maniscalco, Mr. Beckley, Gondola, Glenwood Mountain, or GVC.

## III. CONFIRMATION HEARING

The Court held a confirmation hearing spanning August 14, August 20, and August 21, 2026. Debtor and the Estifanos Creditors called several witnesses who testified as follows:

### A. Sanjay Marken

Debtor began by calling Sanjay Marken ("Mr. Marken"), an investment banker and a Hilco Director. Mr. Marken had heard of Debtor's bankruptcy through an industry news source and reached out to Mr. Maniscalco. Debtor and Hilco signed an engagement letter providing for – in Mr. Marken's eyes – a "fairly standard" fee agreement (Exhibit 9). Under the terms of their agreement, Hilco was to receive a monthly fee followed by a transaction fee if a transaction involving the Park were to be completed. The transaction fee was structured to be the greater of $450,000 or 4.5% of the total transaction value.

Mr. Marken testified to the process by which Hilco marketed the Park. According to Mr. Marken, Hilco began its internal diligence immediately after being engaged. Mr. Marken consulted with other Hilco personnel with amusement park experience, and he and other members of the Bronco Project team reviewed information provided by the Debtor and information available on the Bankruptcy Court docket. On March 31, 2026, Hilco sent a marketing teaser containing preliminary information about the Park (Exhibit 10) to approximately 190 potential investors, who were given a blank nondisclosure agreement to sign for more detailed information. Hilco targeted the 190 investors after screening internal databases and prior contact lists, and after performing additional research into public investment banking transaction databases. Mr. Marken testified each teaser email included specific information as to why that investor was being contacted. He believed the targeted approach generated high-quality responses, as opposed to mass e-mails, which tended to be viewed as spam. Mr. Marken also testified Hilco did not purchase advertising for the sale, stating he had never done so throughout his career. In his view, such advertising might reach additional parties, but those parties might not be "high-quality parties" that could comply with the requirements of a bankruptcy court sale, and the cost would not be a good use of estate resources. Mr. Marken also believed investors who saw public advertising might view the sale as less professionally run.

Thirty-six of the investors signed a nondisclosure agreement and were given a comprehensive presentation about the Park and its proposed sale (Exhibit 11). Mr. Marken testified the presentation was designed to provide detailed information to senior decision makers, who may not devote the time to reviewing every document

available in the data room. The investors were also given access to the virtual data room containing potentially relevant legal documents, real estate information, maps, surveys, and other information they might find necessary prior to submitting a bid (index at Exhibit 12). Mr. Marken testified substantially all of the thirty-six investors accessed the data room.

After the Court entered its Bid Procedures Order, Hilco and Debtor worked to select a “stalking horse bidder” – a bidder chosen at the outset of a sale that provides a floor bid in exchange for compensation if the party is later outbid at auction. Mr. Marken testified in his twenty-year career, he had seen very few cases in which a sale occurred without a stalking horse bidder. Mr. Marken further testified stalking horse transactions rarely occur without bid protection, and the cases that occur without it typically involve bids by senior creditors whose protection would necessarily be paid out of their own cash collateral.

The Bid Procedures order required Debtor to select a Stalking Horse Bidder by June 8, 2026, and other bids were permitted until July 17. Hilco ensured each party seeking to participate in the auction was qualified for the auction – *i.e.*, met criteria intended to facilitate a successful, competitive bidding process. In order to qualify, interested parties were required to post a deposit equal to approximately ten percent of the transaction value, to provide documentation that they were ready, willing, and able to close, and to certify no collusion occurred. Mr. Marken stated two parties did not qualify, despite Hilco’s attempts to correct deficiencies between the bid deadline and the auction. The auction occurred on Friday, July 24, 2026, at the Denver office of Debtor’s counsel. Virtual participation was allowed. Stalking Horse Bidder Glenwood Mountain and GVC underwent thirteen rounds of bidding before GVC submitted the winning offer.

When asked to summarize Hilco’s marketing process for the Park, Mr. Marken testified it was of “above-average” length. When asked whether the marketing period should have been longer, he said no, acknowledging the possibility that additional bidders could participate if the period were longer but also acknowledging the possibility that existing bidders could experience “deal fatigue” if the period dragged on. He also saw no evidence the Park would sell for more money at a later time.

When questioned by the Estifanos Creditors about why Hilco never sought to appraise the Park’s value, Mr. Marken stated debtors do not often seek valuations because the benefit to the bankruptcy estate does not typically outweigh the cost. He did not recall ever being asked to secure a valuation as part of a marketing process. As he explained, an appraisal or another valuation would be data points, but “at the end of the day, if you’re selling an asset, you need someone actually willing to transact, and getting an appraisal doesn’t make one of those parties appear.”

Specifically as to Mr. Beckley’s involvement, Mr. Marken testified Glenwood Tramway and Gondola signed the nondisclosure agreement shortly after Hilco was retained, on approximately March 19. The two parties requested permission to pursue a joint bid, which Hilco considered carefully and then recommended be granted. Mr. Marken explained it was not clear Mr. Beckley, as an individual, could pursue a bid on his own,

and Mr. Marken believed the two parties acting together would present a strong bid. Mr. Marken confirmed Mr. Beckley recused himself during board meetings discussing the sale. Mr. Marken did not observe collusion at any time and had no reason to doubt the auction process was full and fair.

The Court found Mr. Marken to be a credible witness. He was an independent professional, and his testimony was supported by that of other witnesses and by the documentary evidence before the Court.

### B. Scott Nocas

GVC called its managing director, Scott Nocas ("Mr. Nocas"). Mr. Nocas was charged with overseeing GVC's efforts to purchase the Park and was solely responsible for negotiating with Debtor. He was also responsible for the decision to submit a bid for the Park, including terms and conditions of the bid.

Mr. Nocas's testimony was consistent with that of Mr. Marken. Mr. Nocas detailed how GVC provided Hilco with evidence of its financial wherewithal to consummate the proposed sale and provided adequate assurance of future performance in connection with the contracts and liabilities to be assumed. He confirmed GVC was deemed a qualifying bid, and he certified GVC did not engage in any collusion, coordination, or unfair practices with respect to the bidding or sale process.

Mr. Nocas explained Mr. Beckley is a twenty percent minority shareholder in GVC but has no control of GVC beyond "standard minority shareholder protections." Mr. Nocas testified he, not Mr. Beckley, was in control of GVC operations and decisions, including the decision to bid for the Park. Mr. Nocas testified he had no contact with other bidders, including Glenwood Mountain.

Finally, Mr. Nocas testified his company, Gondola, had reached out to Mr. Beckley in approximately 2024 or 2025, as part of Gondola's efforts to learn about all gondola operations in North America. At that time, Mr. Nocas told Mr. Beckley that Gondola would be interested in an opportunity to be more involved with an ownership or partnership opportunity. Mr. Beckley and Off Road provided information to Gondola at the time, but Mr. Nocas did not consider that information to be useful to GVC in submitting its bid, because the information had become stale. After the bankruptcy filing, Mr. Nocas and Gondola received only the information about the Debtor that was available in the data room and did not receive any additional information from Mr. Beckley.

The Court found Mr. Nocas to be a credible witness. His testimony was supported by that of other witnesses and by the documentary evidence before the Court.

### C. Paul Maniscalco

Debtor called Mr. Maniscalco, its Chief Restructuring Officer, who testified as to Debtor's operations. He testified about the bankruptcy filing, which was done to maintain

Debtor's operations as a going concern after the standstill agreements expired. Mr. Maniscalco prepared the schedules and other reports filed with the Court. He also prepared budgeting and expense projections used to negotiate a cash collateral agreement with the Bank as well as those included with the Plan.

Mr. Maniscalco testified Debtor's income depends on the number of guests who visit the Park each day, month, and year. Park attendance historically has been recorded as follows:

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|
| **Jan** | 0 | 5,393 | 9,751 | 5,685 | 6,238 | 5,257 | 5,346 | 6,164 |
| **Feb** | 0 | 5,161 | 6,166 | 6,668 | 6,177 | 4,492 | 4,301 | 4,972 |
| **Mar** | 9,905 | 2,095 | 17,188 | 14,481 | 11,864 | 12,302 | 12,237 | 15,066 |
| **Apr** | 10,921 | 0 | 18,860 | 10,351 | 12,886 | 7,773 | 8,468 | 10,145 |
| **May** | 22,165 | 0 | 28,468 | 15,516 | 21,625 | 21,309 | 24,901 | 20,976 |
| **Jun** | 39,140 | 16,585 | 42,803 | 27,061 | 32,808 | 47,443 | 33,594 | 25,947 |
| **Jul** | 53,395 | 38,343 | 52,066 | 44,211 | 48,619 | 43,235 | 40,026 | 34,310 |
| **Aug** | 38,340 | 17,719 | 25,898 | 29,782 | 31,569 | 29,460 | 31,076 | |
| **Sep** | 21,745 | 18,506 | 15,690 | 20,528 | 21,137 | 19,400 | 13,943 | |
| **Oct** | 17,603 | 19,473 | 15,866 | 21,355 | 18,070 | 19,769 | 16,615 | |
| **Nov** | 6,626 | 8,097 | 8,656 | 7,526 | 6,424 | 7,522 | 8,830 | |
| **Dec** | 8,847 | 11,593 | 9,393 | 9,476 | 9,900 | 11,701 | 12,045 | |
| | | | | | | | | |
| **Total** | 228,687 | 142,965 | 250,805 | 212,640 | 227,317 | 229,663 | 211,382 | 117,580 |

Mr. Maniscalco projected 2026 attendance (and therefore income) would be lower than in past years, considering prevailing weather conditions (specifically, the drought, high temperatures, high winds, and the increased risk of wildfires) and adverse publicity from the State Court Lawsuit and the bankruptcy filing.

Given the projections for lower attendance and income in 2026, Mr. Maniscalco concluded delaying the sale of Debtor's assets to 2027 would not be in the best interests of the estate. Weather patterns could continue to have an adverse impact on attendance, as could rising inflation and lower consumer discretionary spending. Debtor's administrative expense costs are high, as reflected in the Monthly Operating Reports and Fee Applications filed with the Court. Mr. Maniscalco testified if the sale did not occur in the summer of 2026, Debtor may not be able to afford to continue its operations until the summer of 2027. Administrative expense costs of approximately $250,000 per month, multiplied by 6 months, would be $1.5 million. Those expenses would continue through the winter months, when Debtor's income is generally negative, which could affect Debtor's ability to maintain its equipment or even to make its payments to the Bank. The Bank could restrict Debtor's ability to use the Bank's cash collateral and could assess default interest, which would be substantial. Mr. Maniscalco's calculations are included in Exhibit 39.

Mr. Maniscalco further testified about the sale of the Debtor's assets. First, Debtor decided to retain the services of an investment banking firm. Mr. Maniscalco had

previously met Mr. Marken and another Hilco representative at an industry conference, and he believed Hilco had the necessary reputation and experience to facilitate a sale. Mr. Maniscalco also spoke with other investment banking firms, including Houlihan Lokey and SC&H Capital. Mr. Maniscalco was able to negotiate the lowest fees with Hilco, for both the monthly fee and the transaction fee. Mr. Maniscalco recommended Hilco to the GCAP Holdco board, and they agreed to Hilco's retention.

During the sale process, Mr. Maniscalco was actively involved, providing information, giving tours, and otherwise responding to the needs of Hilco or prospective investors. He did not observe any collusion in the process, nor did he observe any improper conduct of Mr. Beckley or GVC. Mr. Maniscalco confirmed that Mr. Beckley recused himself every time the GCAP Holdco board discussed the sale. Mr. Maniscalco was the one who provided information to Mr. Nocas and Gondola. Mr. Maniscalco also encouraged other investors and entities to submit bids, including "Company X" discussed below. Mr. Maniscalco met with representatives of Company X at the Park during their visit and continued to reach out after giving the company a May 26 deadline to submit a stalking horse bid. He believed Company X decided not to submit a bid based on the company's own "number crunching," *i.e.*, its calculations as to the value of the assets to be sold.

Mr. Maniscalco believed the auction process was full and fair. Debtor had every incentive to maximize the value of the Park, and he believed the auction price fairly represented the value of the assets sold. Mr. Maniscalco also believed the winning bidder, GVC, was capable of closing and of carrying out its obligations to the Bank over the course of the Park's continued operations, based on data provided, including the approximately $1.3 million deposit Debtor had received.

Mr. Maniscalco walked through the terms of the Plan, which he signed as Debtor's representative. He testified the Plan restructured Debtor's debt to the Bank, which as of August 31, 2026, would be $12,086,000, and provided for the disposition of the Park assets, with the proceeds allocated among different classes of creditors. Class 2 consisted of the claim of the Estifanos Creditors, which was disputed, as the subject of the pending State Court Appeal. Under the Plan, Class 2 would receive insurance proceeds (approximately $7 to $7.3 million), plus net sales proceeds (approximately $5 to $5.2 million), and the recoveries from the Litigation Trust. Class 3 consisted of the claims of trade vendors, those that had provided goods and services to the Park such as Coca Cola, Sysco, and others that "provide anything from candy to T-shirts" at the Park's retail outlets. Under the Plan, each Class 3 creditor would receive a payment of 10% of its claim. None of the Class 3 claims were disputed. Mr. Maniscalco testified Debtor would be able to make all required payments of administrative expense claims, tax claims, and U.S. Trustee fees. He believed the Plan's classifications and treatment were appropriate and realistic.

Mr. Maniscalco also testified as to Debtor's view of the potential causes of action asserted by Estifanos Creditors. In Mr. Maniscalco's opinion, the bad faith claim against NOVA was appropriately assigned to the Litigation Trust. As to a potential malpractice

claim against the State Court Litigation trial counsel, Debtor believed the claim lacked merit and also believed it needed the continued services and institutional knowledge of trial counsel to pursue the State Court Appeal. As to a potential fraudulent transfer cause of action against GCAP Holdco, the settlement providing for GCAP Holdco to pay all available cash to Debtor provided the best recovery for the estate. Debtor did not believe the other claims asserted, including failure to obtain sufficient insurance, breach of contract against Mr. Beckley, breach of fiduciary duty against Debtor's directors and officers, and alter ego or substantive consolidation with Off Road or the Hot Springs, had merit or value.

Mr. Maniscalco testified to Debtor's value as a going concern, based on projected earnings before interest, taxes, depreciation, and amortization (EBITDA), multiplied by 4, yielding a value of $14 million. Mr. Maniscalco also testified as to Debtor's value on a liquidation basis. He stated the liquidation value of the Park's assets would be much lower than their book value because the rides and attractions were built specifically for the Park's mountaintop location, with the expense of installation constituting a large percentage of their initial cost, and would have little value to a buyer of used equipment. Mr. Maniscalco concluded the Estifanos Creditors would receive their share of $1,244,000 in a liquidation, as opposed to $5 to $5.2 million under the Plan.

The Court found Mr. Maniscalco to be a credible witness. His testimony was supported by that of other witnesses and by the documentary evidence before the Court.

**D. Steve Beckley**

Finally, Debtor called Mr. Beckley, who discussed the Park's beginnings and its growth, noting the additions of rides and attractions over time. He testified the Park's mountainous terrain and limited accessibility required each ride to be custom-built for the location, at great expense. When the Defiance Coaster was added, the Park had 200-ton cranes on the mountain for months, just to set the set the steel and get the coaster built. The cost of the actual ride was approximately $3.6 million, but the installation cost was approximately $5 million. And, given the custom nature of the rides, they had little to no resale value.

Mr. Beckley also testified as to the sale of the ownership of the Park to GCAP Holdco in 2020 for $30 million. That year, the COVID pandemic and the Grizzly Creek fire had sharply reduced Park attendance. The purchasers were unwilling to pay the entire purchase price up front, in case attendance did not stabilize the next year. The parties agreed to structure the transaction in two payments. The first, for approximately $24 million, was to be made in connection with the closing, and the second, for approximately $6 million, was to be made after a certain financial threshold was satisfied. The Park did meet the threshold the next year, in 2021. But, around that time, the tragedy struck (September 2021), and the Bank was unwilling to loan the money needed to finance the second payment. Mr. Beckley testified he and his wife agreed to take a promissory note from GCAP Holdco in lieu of the second payment, and they were still owed $4.5 million on that note.

Mr. Beckley did not want the Park to file for bankruptcy. He offered to loan the Park $1 million to help the Park stay solvent and reach a settlement with the Estifanos Creditors. Ultimately, a settlement was not reached, and Debtor chose to file its bankruptcy case after the last standstill agreement expired. Mr. Beckley testified that as a result of the bankruptcy, he stood to lose $4 million in equity and $4.5 million owed by GCAP Holdco on the promissory note.

After the Debtor's bankruptcy petition was filed, Mr. Beckley approached the GCAP Holdco board and told them he would like to try to buy back the company but needed a partner. Mr. Beckley recalled Gondola had previously expressed some interest in the Park, but at that time, given the pending State Court Litigation, the parties did not pursue a sale or partnership. Mr. Beckley asked the board and Debtor's counsel if he could approach Gondola as a potential partner. The board asked Mr. Beckley to wait until Debtor had hired an investment banker, and Mr. Beckley complied with that request. After Hilco was hired, Mr. Beckley asked Hilco for permission to reach out to Gondola, and he waited until Hilco granted its approval before contacting Mr. Nocas. Mr. Beckley did not provide Mr. Nocas or Gondola any inside information. He asked Mr. Nocas to obtain all information from Hilco or Mr. Maniscalco.

Although Mr. Beckley was one of the members of the GCAP Holdco board, he recused himself from all discussions regarding the sale of the Debtor's assets. The testimony of other witnesses confirms his recusal, which is also noted in the board minutes.

Mr. Beckley testified as to his motivation, as follows:

> You know, this is -- the park has been a lifelong dream of mine. I've worked on it for over 45 years. And you know, I took my wife on one of our first dates here to the park and had her go through the cave. And we've spent a lot of years developing the cave. And even though it's clouded with this unfortunate accident, there's still a lot of emotional ties with this park, with me and my family. So I'd still like to stay involved.

The Court found Mr. Beckley to be a credible witness. His demeanor was calm and professional. He was not evasive or argumentative. His memory was clear, and his statements were consistent. His testimony was corroborated by that of other witnesses and by documentary evidence before the Court. The Court finds he is in fact motivated to stay involved with the Park based on his extensive history with it, he went to great lengths to avoid any improper influence on the sale process, he did not interfere with the sale process, and his involvement with the sale was pursued and accomplished in good faith.

### E. Matt Lausten

The Estifanos Creditors called Matt Lausten ("Mr. Lausten"), a CPA and certified fraud examiner hired by the Estifanos Creditors to examine Debtor's financial records.

Mr. Lausten testified that, within the four years prior to Debtor's bankruptcy filing, Debtor made five transfers to GCAP Holdco, each of which was recorded as a distribution, which transfers totaled $2,987,946. Mr. Lautsen did not consider or determine whether any amounts were returned from GCAP Holdco to the Debtor.

**F. N. Baker Loch**

The Estifanos Creditors called N. Baker Loch ("Mr. Loch"), a vice president at National Value Consultants Inc. ("NVC") and Member of the Appraisal Institute (MAI). Mr. Loch became a Colorado certified general real estate appraiser in early 2023.

The Estifanos Creditors retained Mr. Loch to give a fee-simple, going-concern value appraisal of the Park as of May 27, 2026. Mr. Loch was given a 30 to 60-minute walking tour of the Park and was provided with data items including historical financial operations and attendance.

Mr. Loch performed a direct capitalization analysis, which required him to calculate a "Year 1" amount for the Park's earnings before interest, taxes, depreciation, and amortization (EBITDA) and to multiply that amount by a number calculated to reflect the Park's operating profitability. Mr. Loch selected an EBITDA multiplier of 9.5, based on the multipliers of large, publicly owned amusement parks such as United Parks and Six Flags. In Mr. Loch's opinion, the Park's going concern value was $35.1 million. The Court will discuss Mr. Loch's opinion further below.

**G. Dan Satow**

The Estifanos Creditors called Dan Satow ("Mr. Satow") as their final witness. Mr. Satow has a substantial amount of experience as an auctioneer, including selling amusement park equipment. Mr. Satow reviewed the marketing that was done for the Park and testified that, in his opinion, Hilco's process did not conform to industry standards. Mr. Satow's internet research did not reveal substantial information about the sale, leading him to conclude it was not sufficiently advertised. Mr. Satow contacted Gary Slade, editor and publisher of Amusement Today, "the largest trade publication in the amusement industry," and learned Mr. Slade was not familiar with the Park sale. Mr. Satow opined that proper marketing would involve press releases from local and nationwide newspapers, internet advertising, and trade publication advertising. In his view, it should have been a goal for Debtor to "make as many people know about the auction as possible," and Hilco's "invite-only" process fell short of standard marketing for an asset like the Park.

Though Mr. Satow conceded the purpose of his testimony was not to provide a valuation of the Park, he believed the custom-built nature of the Park equipment would make it harder to value and resell. He also agreed four months was a sufficient marketing time for the Park, although in his opinion, the sale should have been timed to occur during non-busy season, when other amusement park operators would have more time to

conduct due diligence and participate in the sale process. The Court will discuss Mr. Satow's opinion further below.

### H. Nancy Heard

The Estifanos Creditors sought to introduce the deposition testimony of Nancy Heard ("Ms. Heard"), the Park's General Manager. Debtor objected on relevance grounds. The Court finds most of Ms. Heard's testimony lacks relevance to the matters before the Court. The Court will accept Ms. Heard's testimony regarding her operational integration and leadership support for both the Park and the Hot Springs, and her key leadership role in the early development of the Hot Springs, as some evidence supporting the Estifanos Creditors' claim that the two entities are not separate. The Court will discuss Debtor's treatment of this claim further below.

### I. Dennis Reshetnev

The Estifanos Creditors also sought to introduce the deposition testimony of Dennis Reshetnev ("Mr. Reshetnev"), who serves on the boards of GCAP Holdco and IMHS Holdco as a designee of the funds associated with Off Road. Debtor objected on relevance grounds and also objected to the extent Mr. Reshetnev was asked to provide an expert opinion or an opinion on the ultimate issue before the Court. The Court finds much of Mr. Reshetnev's testimony lacks relevance to the matters before the Court. The Court allowed the Estifanos Creditors to present some evidence supporting their argument the Debtor has valuable claims and causes of action, including breach of fiduciary duty and alter ego. To the extent Mr. Reshetnev's testimony supports or contradicts the existence of those causes of action, the Court will allow the testimony but give it little weight. As the Court has held throughout the trial, the Court will not determine whether the causes of action do or do not exist.

### J. Rob Kramer

Finally, the Estifanos Creditors sought to introduce the deposition testimony of Rob Kramer ("Mr. Kramer"), who serves on the boards of GCAP Holdco and IMHS Holdco as a designee of the funds associated with Off Road. Debtor objected on relevance grounds and also objected to the extent Mr. Kramer was asked to provide testimony about something that was not within his knowledge. The Court finds much of Mr. Kramer's testimony lacks relevance to the matters before the Court. The Court allowed the Estifanos Creditors to present some evidence supporting their argument the Debtor has valuable claims and causes of action, including breach of fiduciary duty and alter ego. To the extent Mr. Kramer's testimony supports or contradicts the existence of those causes of action, the Court will allow the testimony but give it little weight. As the Court has held throughout the trial, the Court will not determine whether the causes of action do or do not exist.

The Court has considered Mr. Kramer's testimony regarding the Off Road-associated entities' purchase of the ownership of the Park in 2020, including his

characterizing the deal as a $24 million cash payment plus a $6 million seller note that would be fulfilled if subsequent Park performance goals were met. The Court has also considered his testimony regarding the parties' expectation Park attendance could be increased from 235,000 to 350,000 and higher, as set forth in Exhibit 31, by adding new rides and features over the next decade, based on historical evidence new rides and attractions had increased Park attendance by 10% to 15%. Finally, Mr. Kramer opined as to the value of the Park just before the September 2021 tragedy, based on an EBIDTA of $5 million and a multiplier of 7 to 9. The Court accepts the testimony and discusses it and its weight further below.

The Estifanos Creditors focus on an email Mr. Kramer sent shortly after the tragedy, in which he expressed his opinion that in 10 years the tragedy would be considered an "unfortunate blip" in the Park's history. The Court does not find that email relevant to the matters currently before the Court. As discussed further below, this Court must determine the current value of the Park, not the value in 2020 and not the value in 2030. The Estifanos Creditors argue the Park's value is temporarily depressed because of the tragedy. The evidence before the Court does not show the tragedy is the only factor affecting Park attendance. Other factors include the weather, the economy, the willingness of visitors to drive from Aspen, Vail, or Denver to the Park, and the limits of the Glenwood Springs area's hotels. The evidence before the Court does not support the conclusion Park attendance is likely to increase to 350,000 at any time within the next few years, if ever. Therefore, the Court cannot conclude any depression in the Park's value is temporary. The Court will not allow discussion of the email into evidence.[9]

## IV. VALUATION

Two values are important in this case: going concern value and liquidation value. The Court will discuss each in turn.

### A. Going Concern Value.

The evidence before the Court on the Park's value as a going concern included (1) Mr. Loch's appraisal, (2) the amount paid by funds associated with Off Road in 2020, and (3) the result of the auction. The Court will discuss each in turn, followed by a conclusion (4).

#### 1. Loch Appraisal

As a preliminary manner, Debtor asks the Court to exclude Mr. Loch's appraisal under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). As the Tenth Circuit Court of Appeals has explained:

[9] Even if the Court were to allow the evidence, it would not change the Court's analysis of the value of the assets to be sold, as set forth below.

> Under Federal Rule of Evidence 702, the district court has an important gatekeeping function with regard to the admissibility of expert opinions to ensure that all evidence is both relevant and reliable. *See generally Daubert*, 509 U.S. at 597, 113 S.Ct. 2786. In order to determine whether Meyer and Sullivan's expert opinions were admissible, the district court had to undergo a two-step analysis. First, the court had to determine whether the experts were qualified by "knowledge, skill, experience, training, or education" to render an opinion. *See* Fed. R. Evid. 702. Second, if they were so qualified, the court had to determine whether their opinions were "reliable" under the principles set forth under *Daubert*, 509 U.S. 579, 113 S.Ct. 2786, and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The reliability inquiry asks whether the methodology employed by an expert is valid – that is, whether it is based on sufficient data, sound methods, and the facts of the case. *See Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167. The inquiry does not typically question "the quality of the data used in applying the methodology or the conclusions produced." *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1263 (10th Cir. 2014). However, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

*Roe v. FCA US LLC*, 42 F.4th 1175, 1180-81 (10th Cir. 2022). Here, the call is a close one. It appears Mr. Loch has some training on, and some familiarity with, business valuation, but he does not have a substantial amount of such training or experience. His employer, NVC, provides business valuations. NVC previously performed a business valuation for Debtor, using a discounted cash flow ("DCF") analysis. A DCF analysis is a well-accepted method for establishing a going concern value of a debtor in bankruptcy. *See, e.g., Kool, Mann, Coffee & Co. v. Coffey*, 300 F.3d 340, 362 (3d Cir. 2002) (discussing cases recognizing the use of DCF analysis). But, Mr. Loch did not perform a DCF analysis. Instead, he performed a direct capitalization analysis. A direct capitalization analysis is less helpful than a DCF analysis in this case because a direct capitalization analysis requires stable income and does not allow for annual adjustment to reflect anticipated future changes in income and/or expenses.

In performing his direct capitalization analysis, Mr. Loch determined a "Year 1" amount of earnings before interest, taxes, depreciation, and amortization (EBITDA), projecting 2% growth each year. He used an EBITDA multiplier between 9 and 9.5, based on the multipliers of large, publicly-held amusement park companies, because multipliers of small, privately-held amusement park companies were not available to him. Debtor argues Mr. Loch's Year 1 EBIDTA determination does not accurately reflect the Debtor's earnings, and the multiplier is completely inappropriate. The Court agrees. But, in an abundance of caution, the Court will consider those objections in connection with the

weight of the evidence, not to the admissibility. The Court will, therefore, overrule Debtor's objection to the admission of Mr. Loch's appraisal.

In determining the weight to be given to Mr. Loch's opinion, the Court first considers the appropriateness of a direct capitalization analysis for the amusement park industry in general and for the Park in particular. Mr. Loch's Appraisal Report (the "Report," Exhibit BJ) includes the following background information about the amusement park industry:

> Amusement parks are navigating a dynamic landscape, driven by recent challenges and innovations. In the wake of natural disasters such as hurricanes and wildfires, parks have faced closures and financial setbacks, underscoring the need for robust emergency planning and resilient infrastructure. Despite these disruptions, attendance at amusement parks has surged. The introduction of new parks, such as Universal Epic Universe, highlights how tapping into popular cultural franchises can boost engagement and profit growth. By strategically expanding and innovating amusement parks can stay competitive at a rapidly evolving market. Revenue expanded at a CAGR of 10.3% to $34.3 billion over the years to 2026, including an uptick of 1.4% that year.
>
> The rise in digital integration and family-oriented attractions has reshaped visitor experiences, catering to a broader audience seeking shared adventures. Parks like Disney and Universal have led the charge, with family coasters and themed lands enhancing appeal. This period hasn't been without hurdles, as ticket prices have steadily increased, impacting affordability for many families. Strategies like revised membership models aim to stabilize revenue while making parks more accessible. These trends have set the stage for future growth, reflecting the industry's adaptability.
>
> The next few years promise continued evolution for amusement parks, with projections pointing towards significant expansions and technological advancements. Parks are leaning into diverse themes and experiences to attract both thrill-seekers and families. The integration of beloved video games and digital platforms, highlighted by partnerships like Disney's collaboration with Fortnite, suggests a focus on merging virtual and physical realms to allure a connected generation. Replacing older attractions with innovative designs keep[s] parks fresh and exciting. As parks embrace cutting-edge technologies like AI-enhanced animatronics and wearable tech, they're poised to offer even more personalized and immersive experiences. These efforts are expected to bolster attendance and revenue, securing amusement park[s'] stability over the coming years. Revenue is expected to climb at a CAGR 1.4%, reaching $36.8 billion through 2031.

Report at 66. The Report noted industry revenue volatility was "very high," competition was "high" and "increasing," and innovation was "moderate." *Id.* at 67. The Report describes the following conditions affecting volatility:

- Consumer spending, which "significantly influences spending and attendance at amusement parks." When consumers have more disposable income, they spend more on leisure activities such as amusement park visits, but when consumers cut back on expenses, amusement parks will experience reduced growth.
- Seasonality, which often requires facilities to close during poor weather conditions. The Report notes the use of indoor facilities would allow amusement parks to operate steadily year-round and "stabilize revenue despite seasonal changes."
- Changed themes and expanded offerings to capture new demographics. Amusement parks are offering new themes such as horror and new attractions that cater to different age groups and interests, including thrill-seekers and families alike.
- Extreme weather patterns, which will "continue to challenge amusement parks' stability." The Report notes severe weather events, including hurricanes and wildfires, will "increasingly drive operational and financial volitivity."
- Bringing video game franchises to life, which larger parks are doing by incorporating games such as Super Nintendo, Minecraft, and Fortnite.
- Outdated designs and attractions, which need upgrades. The Report notes: "In the coming years, amusement parks will prioritize innovation and reinvestment over preservation of legacy attractions, as they face heightened competition for visitors' attention and discretionary spending."

*Id.* at 72-74. The Park's earnings are subject to many of the same volatility risks discussed in the report, specifically including consumer spending, extreme weather patterns, and outdated designs and attractions. Given its location, the Park is especially affected by poor weather. It has recently experienced closures due to area wildfires and shutdowns of I-70, the only highway providing access to the Park. Its ability to upgrade its attractions is substantially limited by the Park's size and location, the inaccessibility of which adds exponentially to the cost of installing a new attraction.

Given the volatility in the industry overall, and the factors applicable to the Park in particular, the Court finds a direct capitalization analysis, which depends on a business's having a stable income and a steady future, to be much less helpful than a DCF analysis, which would be able to take into account changing consumer spending, extreme weather, and the capital expense of installing any new attractions.[10]

---

[10] Mr. Satow testified repeat customers require novelty, specifically new rides, and amusement parks wither over time if no new rides are added. The Court is not convinced the Park will wither, and its appeal is not limited to the rides. But, it does seem unlikely the Park will experience continued attendance growth year

Not only does the Court find the helpfulness of a direct capitalization analysis to be low, but also the Court finds the specific numbers used by Mr. Loch to be inappropriate. Mr. Loch's "Year 1" EBITDA of $4,110,582 required attendance of 215,610, a number greater than that of 2020 (142,965), 2022 (212,640), 2025 (211,382), and 2026 to date. To be sure, the low attendance numbers in 2020 were largely attributable to the COVID pandemic. But attendance did not steadily increase every year after that. It increased substantially in 2021, followed by a drop in 2022, an increase in 2023, a slight increase in 2024, a decrease in 2025, and another decrease in 2026. Mr. Loch calculated a mean and described 2025 as "a sigma," which the Court understood to mean deviation. Calculating a mean from numbers that fluctuate widely and discounting the most recent data as a deviation from that mean brings to mind Mark Twain's famous quote about statistics.[11] A mean does not represent the reality of the Park's attendance numbers. A prediction that attendance numbers will "return to the mean" in the future is not based in current reality. Mr. Loch's "Year 1" EBITDA of $4,110,582 is inflated, and when multiplied over time it yields substantially inflated results.

Finally, the EBITDA multiplier Mr. Loch selected is substantially inappropriate. Mr. Loch testified he was constrained to use multipliers of large, publicly-held amusement park companies, because that information is all that was available to him. But common sense compels the conclusion that large companies with higher revenue and earnings have higher multiples than small companies. When he discussed determining an appropriate EBITDA multiplier, Mr. Loch partially acknowledged that distinction, stating: "The subject being a private entity without the scale, marketing or available capital reserves as the publicly traded companies would be perceived as having a higher risk profile, indicating an appropriate multiplier at the lower end of this range." Report at 118. Choosing a rate at the lower end of the range does not justify the use of an inappropriate range. The multipliers of Six Flags (9.75), which operates 26 parks across the United States, Mexico, and Canada, and which has a market capitalization of $2.36 billion and an enterprise value of $7.78 billion; and United Parks (8.9), which operates SeaWorld, Busch Gardens, Discovery Cove, Sesame Place, and other parks across the country, and which has a market capitalization of $2.08 billion and an enterprise value of $5.12 billion, do not provide appropriate measures for the multiplier applicable to the Park. Mr. Loch's use of a multiplier of 9.25, a number not much lower than that of Six Flags and higher than that of United Parks, is inappropriate.

For the reasons discussed above, the Court finds Mr. Loch's $35,100,000 value conclusion to be inflated and inaccurate. It is not a fair valuation of the Park as a going concern.

---

after year without new rides, which would require substantial additional capital expenditures. The timing and amount of those expenditures would need to be considered in any accurate projection of Debtor's value based on income.

[11] "There are three kinds of lies: lies, damned lies, and statistics"

Mr. Loch also valued the real estate (land and building) at $13,100,000, based on comparables of vacant industrial and agricultural properties. The properties used as comparables are not, in fact, comparable to Debtor's property, which reduces the soundness of the valuation. Finally, Mr. Loch valued the personal property (furniture, fixtures, and equipment) – in which category he included the rides, cave improvements, the gondola, and utility lines – at $17,200,000, based on the book value of those assets. The Court appreciates the scope of Mr. Loch's employment was limited and did not include an appraisal of the rides, cave improvements, and the gondola. Mr. Loch spent only 30-60 minutes at the Park, which would not be a sufficient amount of time to gauge the condition of the personal property. But, copying and pasting book value into a Report does not constitute performing a valuation analysis of personal property. The Court does not find the personal property's book value reflects its sale value, given the undisputed evidence that the rides were custom built for the mountaintop location; required inordinate expenditures of time, energy, and money to install; and would have very low resale value.

In conclusion, the Court gives little to no weight to Mr. Loch's opinion of the value of the Park.

### 2. Off Road

A series of investor entities associated with Off Road acquired an indirect majority ownership interest in Debtor through a transaction that closed in December 2020. The total purchase price was $30,000,000, of which approximately $24,000,000 was to be paid in cash in connection with the closing, and approximately $6,000,000 was to be paid later, depending on certain contingencies. The contingencies may have been satisfied, but after September 2021, the Bank would not lend the funds to make the payment. The $6,000,000 payment was made in the form of a promissory note from GCAP Holdco.

At the time of the Off Road associated entities' purchase, the COVID pandemic had drastically reduced the Park's earnings. But, as set forth on Exhibit 31, the Off Road investors looked to 2019's performance (attendance of 228,687), to the improvements that had been made and were scheduled to be made (including a retail expansion, an event center, and the addition of Defiance, a new coaster), and to other efficiencies and improvements that could be made. Historically, when the Park had added a new attraction, attendance had increased 10 to 15%. With the Defiance Coaster and other improvements, the investors anticipated attendance would exceed 300,000 by 2025 and could grow to 500,000 by 2030.

After the sale, capital improvements were completed, and the Defiance Coaster opened. But, the expected increase in attendance did not materialize. A number of reasons could explain this. The Estifanos Creditors' daughter's tragic death in 2021 certainly had an impact. Rising inflation and reduced consumer spending had an impact. Perhaps the surrounding area, with relatively few hotels, lacked the infrastructure needed to support 300,000 to 500,000 visitors per year.[12] Perhaps the investors' expectation that

[12] This was Mr. Beckley's opinion.

the Park would draw more visitors from Aspen and Vail, and even from Denver, was too optimistic. Denver's two amusement parks, Elitch Gardens and Lakeside, remain open. In the Court's view, no one cause explains the Park's failure to achieve the investors' expectations. But, explained or not, the failure persists. At this time, the Court cannot find the Park is worth what the investors paid for its ownership in 2020.

The Court has considered the deposition testimony of Robert Kramer, managing partner of Off Road Capital Partners and GCAP Holdco board member. When asked what the Park would have been worth immediately prior to September of 2021, he responded as follows:

> A: Well, as I recall, in 2021, the park did about $5 million of EBITDA. So we probably would have said, hey, that park would be worth, you know, some multiple of EBITDA; let's call it no less than seven and no more than nine or ten multiple EBITDA.
>
> Q: Okay.· So that's no less than seven times five and no more than --
>
> A: Yeah, so let's call it 35 to – let's say, 35 to 50 million.

Deposition of Robert Kramer, at 281, lines 4-14. Mr. Kramer, off the top of his head, conducted the same analysis Mr. Loch did. For the reasons discussed above, the Court cannot find a $5 million EBITDA is an appropriate starting point for a valuation today, and the Court cannot find a number between 7 and 10 to be an appropriate EBITDA multiplier today. Mr. Kramer's estimate of the Park's value in 2021 does not represent the current value of Debtor's assets.[13]

Finally, Off Road, an organization that evaluates and pursues investment opportunities, did not submit a bid for Debtor's assets,[14] which weighs against the conclusion the assets are worth more than $15 million today.

### 3. Auction

Hilco, a leading investment banking firm with offices in New York and Chicago, employes professionals with decades of experience handling hundreds of distressed sell-side transactions. The Delaware Court approved Hilco's employment by order entered April 14, 2026 (docket #133). Hilco then conducted an extensive four-month marketing effort, contacting over 180 potential acquirers, securing 32 signed nondisclosure agreements, and providing data room access to interested parties.

[13] The Court assumes Mr. Kramer is qualified to give testimony about the value of the Park, given his involvement with the Debtor. By that same token, Mr. Maniscalco is also qualified to give testimony about the value of the Park, and he values the Park at $14 million, based on more recent earnings data and using an EBITDA multiplier of 4.

[14] The Bankruptcy Code does not prohibit equity holders from purchasing a debtor's assets, provided non-insiders are also allowed to participate in a competitive auction. *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 454-58 (1999).

This Court approved bidding procedures in its Bid Procedures Order (docket #225), entered May 27, 2026, after a hearing at which parties including the Estifanos Creditors participated. Pursuant to the Bid Procedures Order, the deadline to submit qualified bids was July 17, 2026. Debtor received two qualified bids by that deadline: one from Glenwood Mountain, and one from GVC.

Debtor held an auction on July 24, 2026, which included thirteen rounds of bidding, ending when the last qualified overbid was not countered. GVC's winning bid exceeded Glenwood Mountain's best and final offer by $100,000. Debtor estimates GVC's purchase price will total $14,786,000, which includes (1) assumption of the Bank's secured loan, estimated to have a balance of $12,086,000 at closing, (2) $2,700,000 in additional cash, and (3) assumption of the Cure Amounts detailed in the Assumption and Assignment Notice. GVC is purchasing all of Debtor's assets with the exception of the Excluded Assets set forth in the Asset Purchase Agreement, and GVC will assume the contracts set forth on the Disclosure Schedule attached to the Asset Purchase Agreement.

Debtor designated Glenwood Mountain as the Backup Bidder. Debtor estimates Glenwood Mountain's purchase price would total $14,686,000, based on assumption of the Bank's secured loan, $2,207,000 in additional cash, and assumption of the Cure Amounts. If the Backup Bidder becomes the purchaser, it would purchase all of Debtor's assets with the exception of the Excluded Assets set forth in the Asset Purchase Agreement attached to docket #286.

The Estifanos Creditors offered the testimony of Mr. Satow, an equipment auctioneer, who testified Hilco's marketing process was insufficient. In Mr. Satow's opinion, the auction should have been advertised to the public and in trade publications such as Amusement Today. Mr. Satow reviewed the list of entities who received Hilco's teaser email and concluded only nine were amusement park operators, which he believed was too small a number. Mr. Satow further opined that the timing of the sale process, during amusement park busy season, deterred potential purchasers who would not have been able to conduct sufficient due diligence during the time frame established in the Bid Procedures Order. Mr. Satow did not disagree with the adequacy of the four-month time frame of the marketing efforts.

The Court appreciates Mr. Satow's substantial experience as an auctioneer, including experience selling amusement park equipment. But, Mr. Satow is not an investment banker. He does not have experience selling businesses on a going concern basis. Here, a national investment banking firm with Hilco's experience and expertise was better suited to the sale of Debtor's assets. Mr. Marken testified to the reasons Hilco made the choices it made, and the Court finds Hilco's marketing was appropriate in the circumstances of this case. As to the timing of the sale process, the Court is not persuaded an auction taking place in late 2026 or early 2027 would have yielded a higher result. The longer the Park shows lower attendance counts and lower earnings, the less valuable it is to investors. More importantly, it is not clear Debtor had the luxury of that much more time. As Mr. Maniscalco testified, and as reflected in the monthly operating

reports and fee applications filed with this Court, Debtor's administrative expenses are high. As the year wears on, and the Park becomes less busy, generating less income, Debtor runs the risk of not being able to make payments on the Bank's loan. And, as the party with an interest in Debtor's cash collateral, the Bank would have to consent to the Debtor's use of cash over an extended period of time. Ultimately, this is a bankruptcy case, and bankruptcy cases often must move quickly. The Court finds the timeline set in the Bid Procedures Order to be appropriate, considering the totality of the circumstances.

The Estifanos Creditors argue Mr. Beckley's involvement with GVC tainted the auction. The Court cannot so find. Mr. Beckley testified credibly that he recused himself from all board discussions regarding the sale, and he directed Mr. Nocas to Mr. Maniscalco for all questions Mr. Nocas or others in Gondola or GVC may have had about Debtor's operations or value. Mr. Nocas testified credibly that he, not Mr. Beckley, made the decisions regarding the bids GVC submitted at the auction. Mr. Beckley's and Mr. Nocas's testimony was consistent with that of other witnesses and was supported by documentary evidence. In contrast, the Estifanos Creditors produced no evidence of improper influence or collusion, despite extensive discovery including two depositions of Mr. Beckley and one of Mr. Nocas.

In support of their argument that the auction was tainted, the Estifanos Creditors point to the activities of one company whose name will remain confidential ("Company X"). Representatives of Company X signed a nondisclosure agreement, reviewed data in the data room, spoke with Mr. Maniscalco, and visited the Park. One of its representatives stated Company X was interested in submitting a bid in the amount of $15 to $20 million, but it wanted to be the Stalking Horse Bidder. At that point, Debtor had three potential Stalking Horse Bidders. Debtor asked Company X to make its bid by May 26, which was less than two weeks before the deadline to submit the Stalking Horse Bid, as set in the Bid Procedures Order. Company X did not make a bid by May 26. Debtor subsequently selected Glenwood Mountain, a company with no ties to Debtor's insiders, as the Stalking Horse.

The Estifanos Creditors argue the May 26 deadline was artificially imposed and calculated to prevent Company X from submitting a bid. The Court disagrees. The deadline was appropriate, given the need to pick one of two or more candidates before the June 8 deadline. More importantly, Company X was not prevented from submitting a bid. Mr. Marken reached out to Company X to encourage it to submit a bid. Mr. Maniscalco reached out to Company X's representatives more than once after May 26, but the representatives would not return his calls. Company X was welcome to submit a bid and had until July 17 to do so. It did not submit a bid.

The Court finds it unlikely that a company truly willing to pay $15 to $20 million for Debtor's assets would decline to participate in the auction process after learning the Stalking Horse Bid was lower than $15 million. The Court further finds it unlikely that a company truly willing to purchase Debtor's assets would abandon that effort because it was not selected as the Stalking Horse Bidder. GVC also wanted to be the Stalking Horse Bidder, but Debtor did not select it. Debtor's choice did not dissuade GVC.

The Court finds the most likely reason Company X did not participate in the auction is that it decided it did not want to buy Debtor's assets. The bidder that did not bid is not the dog that did not bark. There is no mystery to be solved. The Court specifically finds the process by which Debtor selected a Stalking Horse Bidder to be within Debtor's business judgment, made independently of any participation of Mr. Beckley, for a legitimate business purpose and in the absence of bad faith, collusion, or improper motive. In all respects relating to the selection of the Stalking Horse Bidder and the conducting of the auction, Debtor satisfied the requirements of the Bankruptcy Code and this Court.

Finally, the Estifanos object to the payment of breakup fees to the Stalking Horse Bidder. Such fees are typical in bankruptcy sales and serve to encourage auction participation, increasing the ultimate sales price of the assets. Here, the Stalking Horse Bidder's participation did encourage auction participation and increased the ultimate sales price. The Estifanos Creditors argue they alone bear the burden of paying those fees. But, it is not as if the Plan specifically provides the costs of sale are assigned to Class 2. Instead, the estate's expenses are paid, Class 3 is paid a specific amount, and all remaining funds are held for the benefit of Class 2, pending resolution of the State Court Appeal. The Court finds Debtor's payment of the Stalking Horse Bidder's fees, as discussed in hearings before the Court[15] and set forth in the Court's orders, is an appropriate use of the estate's funds.

### 4. Conclusion

The Court cannot find Mr. Loch's appraisal or the funds associated with Off Road's purchase price supports the conclusion that Debtor's assets are worth more today than the amount generated from the auction. Debtor's assets were well-marketed by an independent, experienced professional investment banking firm; the bidding process was conducted appropriately and in good faith, with no improper conduct or influence of Mr. Beckley; and the auction was robust. The entire sale process was properly executed to obtain the highest price. An auction is a well-established method to obtain an accurate price for a debtor's assets. As Judge Easterbrook observed:

> Investment banks make a living by peddling assets to willing buyers. The potential buyers in a case like this include investment syndicates and even [creditors and stockholders]. If the $15.5 million settlement was too steep a discount, someone would have been willing to bid more in an auction. . . . If $15.5 million were at or above the expected value [of the debtor's asset], no one would buy the firm at a higher price; if the [opposing] experts were right, a buyer could be found. The competitive process would bring more

[15] The Estifanos Creditors argue Debtor agreed to limit or cap the Stalking Horse Bidder's fees. The Court cannot so find. At the relevant hearing, the U.S. Trustee and the Estifanos Creditors argued a large breakup fee may be inappropriate if the Stalking Horse Bidder were an insider. Debtor agreed a limit would be appropriate in that case. But, that was not the case. The Stalking Horse Bidder was not an insider, and its expenses should not be limited as if it were.

> information to bear, and its outcome would be more reliable than that of a hearing in court—for self-interest concentrates the mind, and people who must back their beliefs with their purses are more likely to assess the value of the judgment accurately than are people who simply seek to make an argument. Astute investors survive in competition; those who do not understand the value of assets are pushed aside. There is no similar process of natural selection among expert witnesses and bankruptcy judges.

*In re Central Ice Cream Co*., 836 F.2d 1068, 1072 n.3 (7th Cir. 1987). Here, the Court finds the outcome of the auction is more reliable than the opinion testimony presented to the Court. The Court finds the going concern value of Debtor's assets is not higher than GVC's purchase price established at the auction, estimated to total $14,786,000.

**B. Liquidation Value.**

Mr. Maniscalco testified as to the following information regarding assets that could be available for liquidation by a Chapter 7 Trustee, compared to those available under the Plan:

| | **Plan** | **Liquidation** |
|---|---:|---:|
| Cash | $4,882,000 | $4,882,000 |
| GCAP Holdco | $867,000 | $867,000 |
| Pro-Rates | $250,000 | |
| Asset Sales Proceeds | $1,000,000 | $9,100,000 |
| TOTAL INFLOWS: | $6,999,000 | $14,849,000 |

Mr. Maniscalco's numbers likely overstate the amounts available for liquidation. Debtor's administrative expenses have depleted Debtor's available cash, and the Park's busy season has ended, reducing its cash replenishment. Mr. Maniscalco included the same amount for a recovery from GCAP Holdco in both the Plan and liquidation columns, which may not be appropriate. GCAP Holdco may be less willing to turn over all its available cash to a Chapter 7 Trustee, and a Chapter 7 Trustee may incur additional expenses pursuing an avoidance action against GCAP Holdco. Finally, Mr. Maniscalco's calculations include cash and asset sale proceeds totaling $13,982,000 as if they would be available for distribution to unsecured creditors, when those assets are subject to the Bank's security interest. If Debtor's case were to proceed in Chapter 7, the Bank may be able to enforce its security interest against those assets, leaving little to nothing available for distribution to Debtor's unsecured creditors, including the Estifanos Creditors.

Mr. Maniscalco also testified as to the following information regarding costs and expenses that could apply to liquidation by a Chapter 7 Trustee, compared to those under the Plan:

| | Plan | Liquidation |
|---|---|---|
| Secured Debt payoff | | $12,086,000 |
| Pro-Rates | $125,000 | |
| Bank Fees - Senior Secured Lender | $100,000 | $0 |
| KERP | $180,000 | $0 |
| Professional Fees (including UST Fees) | $400,000 | $400,000 |
| Wind Down / Liquidating Expenses | $100,000 | $100,000 |
| Investment Banking Fees | $575,000 | $0 |
| Chapter 7 Trustee | | $250,000 |
| Special Trustee (Litigation Trust) | $100,000 | $0 |
| General Unsecured | $25,000 | $0 |
| Holdback for Estate | $1,000,000 | $769,000 |
| TOTAL OUTFLOWS: | $2,605,000 | $13,605,000 |

Mr. Maniscalco's numbers likely understate the applicable costs and expenses. The Bank may be entitled to interest at a default rate, which is not included in Mr. Maniscalco's estimate. And, as discussed above, the Bank may be able to enforce its security interest in all of Debtor's assets, leaving little to nothing available for distribution to Debtor's unsecured creditors, including the Estifanos Creditors.

Mr. Maniscalco concluded as follows:

| | Plan | Liquidation |
|---|---|---|
| Remaining Amount for Distribution to General Unsecured Creditors: | $4,394,000 | $1,244,000 |
| Projected Asserted GUC Claims: | $120,517,004 | $120,517,004 |
| Projected Recovery for GUC: | 3.65% | 1.03% |

Under Mr. Maniscalco's analysis, unsecured creditors would receive much less under liquidation than under the Plan. In the Court's view, the difference may be even more pronounced than the numbers show. At any rate, the Court finds Debtor's liquidation value under Chapter 7 is much less than the amount Debtor's creditors would receive under the Plan. In a Chapter 7 liquidation, Debtors unsecured creditors, including the Estifanos Creditors, may receive nothing.

## V. BANKRUPTCY CODE §§ 1125 AND 1129

Section 1125 of the Bankruptcy Code provides as follows:

(a) In this section—

(1) "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information; and

(2) "investor typical of holders of claims or interests of the relevant class" means investor having—

(A) a claim or interest of the relevant class;

(B) such a relationship with the debtor as the holders of other claims or interests of such class generally have; and

(C) such ability to obtain such information from sources other than the disclosure required by this section as holders of claims or interests in such class generally have.

11 U.S.C. § 1125.[16]

Section 1129 provides as follows:

(a) The court shall confirm a plan only if all of the following requirements are met:

(1) The plan complies with the applicable provisions of this title.

[16] Further references to "section" shall be to those of the Bankruptcy Code, 11 U.S.C., unless otherwise indicated.

(2) The proponent of the plan complies with the applicable provisions of this title.

(3) The plan has been proposed in good faith and not by any means forbidden by law.

(4) Any payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable.

(5)

(A)

(i) The proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

(ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy; and

(B) the proponent of the plan has disclosed the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider.

(6) Any governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval.

(7) With respect to each impaired class of claims or interests—

(A) each holder of a claim or interest of such class—

(i) has accepted the plan; or

(ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date; or

(B) if section 1111(b)(2) of this title applies to the claims of such class, each holder of a claim of such class will receive or retain under the plan on account of such claim property of a value, as of the effective date of the plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims.

(8) With respect to each class of claims or interests—
(A) such class has accepted the plan; or
(B) such class is not impaired under the plan.

(9) Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the plan provides that—
(A) with respect to a claim of a kind specified in section 507(a)(2) or 507(a)(3) of this title, on the effective date of the plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim;
(B) with respect to a class of claims of a kind specified in section 507(a)(1), 507(a)(4), 507(a)(5), 507(a)(6), or 507(a)(7) of this title, each holder of a claim of such class will receive—
(i) if such class has accepted the plan, deferred cash payments of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
(ii) if such class has not accepted the plan, cash on the effective date of the plan equal to the allowed amount of such claim;
(C) with respect to a claim of a kind specified in section 507(a)(8) of this title, the holder of such claim will receive on account of such claim regular installment payments in cash—
(i) of a total value, as of the effective date of the plan, equal to the allowed amount of such claim;
(ii) over a period ending not later than 5 years after the date of the order for relief under section 301, 302, or 303; and
(iii) in a manner not less favorable than the most favored nonpriority unsecured claim provided for by the plan (other than cash payments made to a class of creditors under section 1122(b)); and

(D) with respect to a secured claim which would otherwise meet the description of an unsecured claim of a governmental unit under section 507(a)(8), but for the secured status of that claim, the holder of that claim will receive on account of that claim, cash payments, in the same manner and over the same period, as prescribed in subparagraph (C).

(10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

(12) All fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan.

(13) The plan provides for the continuation after its effective date of payment of all retiree benefits, as that term is defined in section 1114 of this title, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of this title, at any time prior to confirmation of the plan, for the duration of the period the debtor has obligated itself to provide such benefits.

(14) If the debtor is required by a judicial or administrative order, or by statute, to pay a domestic support obligation, the debtor has paid all amounts payable under such order or such statute for such obligation that first become payable after the date of the filing of the petition.

(15) In a case in which the debtor is an individual and in which the holder of an allowed unsecured claim objects to the confirmation of the plan—

(A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the value of the property to be distributed under the plan is not less than the projected disposable income

of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

(16) All transfers of property under the plan shall be made in accordance with any applicable provisions of nonbankruptcy law that govern the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust.

(b)

(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

(A) With respect to a class of secured claims, the plan provides—

(i)

(I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

(II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

(ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such

liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of the indubitable equivalent of such claims.

(B) With respect to a class of unsecured claims—

(i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

(C) With respect to a class of interests—

(i) the plan provides that each holder of an interest of such class receive or retain on account of such interest property of a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or

(ii) the holder of any interest that is junior to the interests of such class will not receive or retain under the plan on account of such junior interest any property.

11 U.S.C. § 1129.

As the proponent of the Plan, Debtor must establish compliance with each of the above requirements by a preponderance of evidence. *FB Acquisition Prop. I, LLC v. Gentry (In re Gentry)*, 807 F.3d 1222, 1226 (10th Cir. 2015); *In re Valley View Shopping Ctr., L.P.*, 260 B.R. 10, 22 (Bankr. D. Kan. 2001).

"The Court is not permitted to alter the terms of the plan. It must merely decide whether the plan complies with the requirements of section 1129(b). If so, the plan is confirmed, if not the plan is denied confirmation." Bankruptcy Reform Act of 1978, H.R. Rep. No. 95-595, at 414 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6370.

## VI. COMPLIANCE WITH §§ 1125 AND 1129.

The Court will discuss each applicable Bankruptcy Code section in turn.

### A. § 1125.

By Order entered July 7, 2026 (docket #302), the Court clarified its June 11, 2026, 2026 Order (docket #250), to confirm conditional approval of the adequacy of information contained in the combined Plan and Disclosure Statement (docket #242). The Estifanos Creditors object to final approval of the disclosure contained therein, asserting it does not contain "adequate information" required under § 1125 because it does not contain an appraisal or similar valuation of the Debtors' assets. The Court disagrees. Section 1125(b) specifically provides: "The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets."

Here, the combined Plan and Disclosure Statement provides detailed information about Debtor's history and finances; the events leading to Debtor's bankruptcy filing; significant events in Debtor's bankruptcy case; Debtor's analysis of assets of the estate, including potential causes of action; Debtor's plan to sell almost all its assets free and clear of liens, including information about the Stalking Horse Bidder, the bidding process, and the auction process; the establishment of the litigation trust; the treatment of executory contracts; the classification of claims; the means for plan implementation; and a delineation of Debtor's responsibilities post-confirmation. It includes audited financial statements for 2023 and 2024 and unaudited financial statements for 2025 and January through March of 2026. It also includes a liquidation analysis estimating the potential effect of a Chapter 7 distribution. This information is more than adequate for the hypothetical investor's needs.

The Court cannot find additional information is needed or would be cost-effective to provide. The Court specifically finds the Estifanos Creditors – the only party to object to the adequacy of information – have much more information than a typical hypothetical investor would have, as a result of their discovery conducted during the State Court Lawsuit and during the pendency of this bankruptcy case. At this point, additional information would "merely add[] to the length and not the effectiveness of the disclosure." *In re Stanley Hotel, Inc.*, 13 B.R. 926, 935 (Bankr. D. Colo. 1981). The Court finds Debtor has met its burden of proving the adequacy of information contained in the combined Plan and Disclosure Statement.[17] Section 1125 is satisfied.

### B. § 1129(a)(1).

To satisfy § 1129(a)(1), Debtor must prove the Plan complies with applicable provisions of the Bankruptcy Code, with a focus on the provisions set forth in § 1122 governing classification of claims and in § 1123 governing the contents of a plan. Bankruptcy Reform Act of 1978, S. Rep. No. 95-989, at 126 (1978), *reprinted in* 1978

[17] Debtor has also shown its compliance with the solicitation requirements of § 1125 (docket #319).

U.S.C.C.A.N. 5787, 5912; H.R. Rep. No. 95-595, at 412 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368. The Court will discuss each section in turn.

**1. § 1122**

Under § 1122(a), "a plan may place a claim or interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." As the Bankruptcy Appellate Panel explained: "As a result, a plan proponent cannot place dissimilar claims together in the same class, such as secured claims with unsecured claims, or priority unsecured claims with non-priority unsecured claims. But § 1122(a) does not require the converse – that similar claims be placed in the same class." *In re Novinda Corp*., 585 B.R. 145, 154 (10th Cir. BAP 2018) (citing *In re City of Colo. Springs Spring Creek Gen. Improvement Dist*., 187 B.R. 683, 687 (Bankr. D. Colo. 1995) ("There is no requirement that all substantially similar claims be placed in the same class nor is there a prohibition against classifying substantially similar claims separately.")). Instead, courts generally permit separate classification of similar claims, provided the separate classification is not used to gerrymander the vote on plan confirmation. *Id.* Here, the Estifanos Creditors argue Debtor has done just that. The Court cannot agree.

First, as to Class 1, the secured claim of the Bank, and Class 4, the interest of GCAP Holdco, separate classification is required. That claim and interest do not share the same priority or legal character with the claims of the unsecured creditors in Classes 2 and 3.

As to Classes 2 and 3, Debtor has provided a legitimate, reasonable business justification for the separate classification. In Class 2, the Estifanos Creditors' claim is based on a tort judgment awarding non-economic and punitive damages, which judgment is the subject of the pending State Court Appeal. If Debtor succeeds on the State Court Appeal, the Estifanos Creditors' claim could be substantially reduced, perhaps as low as the $250,000 statutory cap on non-economic damages, which would reduce the punitive damages to $250,000 plus prejudgment interest. Resolution of the State Court Appeal could take years, and until the amount of the Estifanos Creditors' claim is finally determined, the claim cannot be paid. In contrast, in Class 3, the trade creditors' claims are based on the costs of goods and services provided to the Debtor. The amounts owed are established and undisputed, and payment of those claims should not be delayed during the pendency of the State Court Appeal.

The Estifanos Creditors argue this Court should ignore the differences between the litigation claim and the trade claims because Debtor is responsible for creating the differences. The Court cannot so find. The claims of the two classes arose independently from each other, and Debtor has separately and sufficiently justified its basis for pursuing the State Court Appeal.

A similar separation between claims of litigation creditors and claims of trade creditors was allowed in the Bankruptcy Court for the Southern District of New York, which held as follows:

> The classification structure in the Plan is based on the requirement that the Debtors recognize the similar legal character of the claims and equity interests grouped together, and the different legal character of those Claims and Equity Interests that are classified separately. The Trade Claims are generally liquidated Claims, as opposed to the Other Unsecured Claims, which are primarily unliquidated litigation and rejection damage Claims. While Classes containing both types of claims require reserves, the reserves for the Other Unsecured Claims may be subject to significant fluctuation based on the outcome of certain litigation. Classifying Trade Claims apart from Other Unsecured Claims insulates the former against the risk that the reserves for the latter are not capable of precise estimation. Such motivation is more than sufficient reason for the classification structure embodied in the Plan, and I find, as a fact or mixed question of fact and law, that the classification structure was not established to gerrymander an impaired assenting class. Accordingly, the Plan complies with section 1122 of the Bankruptcy Code and relevant Second Circuit caselaw.

*In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 247 (Bankr. S.D.N.Y. 2007) (footnotes omitted). Here, the Court finds Debtor's stated intention to treat the types of unsecured claims separately based on their different legal character, disputed nature, and need for delay in payment to be more than sufficient reason to separately classify Class 2 and Class 3.

Finally, the Court finds it unlikely that Debtor intended to gerrymander Classes 2 and 3 to obtain an impaired accepting class because it did not need Class 3 to accept. Class 1, an impaired class, accepted the Plan.[18] The Court finds the Plan's classification structure was not established to gerrymander an impaired assenting class. The Plan satisfies § 1122(a).

Section 1122(b) is inapplicable. The Plan does not include an administrative convenience class.

For the reasons set forth above, § 1122 is satisfied.

**2. § 1123(a)**

Subsection (a) sets forth provisions a plan must contain. Here, there is no dispute the Plan designates classes of claims, specifies which classes are impaired, and specifies the treatment of each class. The Plan thus satisfies subsections (a)(1) through (a)(3). The Plan also provides the same treatment for the members of each class and thus satisfies subsection (a)(4).

[18] The Court will discuss below the Estifanos Creditors' argument that Class 1 is not impaired.

As to subsection (a)(5), the Plan provides adequate means for implementation. Debtor will take certain actions as set forth in Plan § 5.04, including pursuing the State Court Appeal; will sell substantially all of its assets (all real estate and improvements thereon, all fixtures and rides at the Park, all owned equipment and other personal property, permits and trademarks)[19] to the Purchaser, free and clear of liens;[20] and will create and fund the Litigation Trust and assign thereto the Litigation Trust Cause of Action. After Debtor has fulfilled the responsibilities set forth in the Plan, its Chief Wind-Down Officer, Mr. Maniscalco, will wind up and dissolve Debtor. Subsection (a)(5) is satisfied.

Subsection (a)(6) does not apply here because Debtor is an LLC. To the extent applicable, it is satisfied.

As to subsection (a)(7), the Plan provides for Mr. Maniscalco to serve as Chief Wind-Down Officer. The evidence before the Court shows he is well qualified to do so, and his service is consistent with the interests of creditors and equity security holders and with public policy. The Plan also provides for Joli Lofstedt to serve as Trustee of the Liquidation Trust. The evidence before the Court shows she is well qualified to do so, as an independent professional with substantial knowledge and experience, and her service is consistent with the interests of creditors and equity security holders and with public policy.[21]

Subsection (a)(8) does not apply here because Debtor is not an individual.

For the reasons set forth above, all subsections of § 1123(a) are satisfied.

**3. § 1123(b)**

Subsection (b) sets forth provisions a plan may contain. Here, there is no dispute as to the Plan's compliance with subsections (b)(1),[22] (b)(2), (b)(4),[23] (b)(5), or (b)(6).[24] The Estifanos Creditors object to the Plan's treatment of the estate's claims and causes of action under subsection (b)(3).

---

[19] Subsection (b)(4) specifically allows a plan to provide for the sale of substantially all of the property of the estate.

[20] Subsection (a)(5)(D) specifically allows a plan to include provisions to sell "all or any part of the property of the estate, either subject to or free of any lien." A sale free and clear under a Chapter 11 plan is broader than a sale free and clear under § 363(f), and a plan proponent need not demonstrate compliance with each requirement of § 363(f) to accomplish a sale free and clear under a plan. 7 *Collier on Bankruptcy* ¶ 1129.04 (16th ed. rev. 2026).

[21] The Estifanos Creditors initially objected to Ms. Lofstedt's appointment as Trustee of the Liquidating Trust, but that objection was withdrawn.

[22] The Court will discuss below the Estifanos Creditors' argument that Class 1 is not impaired.

[23] The Plan's providing for the sale of substantially all of Debtor's property is discussed above.

[24] The Plan includes provisions regarding the Purchaser's good faith under § 363(m). Such provisions may be contained in a plan when there is no dispute regarding them or when there is evidence to support them. The Court's specific findings regarding 363(m) are set forth below.

Subsection (b)(3) states a plan may provide for the following:

> (A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or
> (B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest[.]

The Plan defines the "Litigation Trust Cause of Action" as follows: "all contractual rights and potential cause of action for extra-contractual liability against the Debtor's former commercial general liability insurance carrier, NOVA Casualty Company for bad faith under applicable state law." Plan § 1.63. The Litigation Trust Cause of Action will be transferred to the Litigation Trust as of the Effective Date. Plan § 5.03(iii). The Plan further provides "any Cause of Action not transferred to the Litigation Trust shall be extinguished and not preserved." *Id.* The Court will discuss separately (a) the Debtor's and estate's claims being settled, released, or extinguished, and (b) the litigation trust.

**a. Claims being settled, released, or extinguished.**

Subsection (b)(3)(A) allows a debtor to settle or release its own claims, including derivative claims brought on its behalf. Subsection (b)(3)(A) does not allow a debtor to release claims belonging to third parties without consent. *Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 216 (2024). The Plan currently before the Court settles, releases, or extinguishes Debtor's claims only and does not violate *Purdue Pharma*.

The standards for settlement approval are well established:

> The decision of a bankruptcy court to approve a settlement must be "an informed one based upon an objective evaluation of developed facts." In considering the propriety of the settlement it is appropriate for the court to consider the probable success of the underlying litigation on the merits, the possible difficulty in collection of a judgment, the complexity and expense of the litigation, and the interests of creditors in deference to their reasonable views.

*In re Kopexa Realty Venture Co.,* 213 B.R. 1020, 1022 (10th Cir. BAP 1997) (quoting *Reiss v. Hagmann*, 881 F.2d 890, 892 (10th Cir.1989)). "A mini-trial on the matters under consideration is unnecessary; it is enough for the court to 'canvass . . . the issues and see whether the settlement falls below the lowest point in the range of reasonableness.'" *Kearney v. Unsecured Creditors Comm.*, 987 F.3d 1284, 1295 (10th Cir. 2021) (quoting *In re Dennett*, 449 B.R. 139, 145 (Bankr. D. Utah 2011) (further quotation omitted)).[25]

---

[25] Here, the Court specifically declined to conduct a mini-trial on the underlying claims. By Order entered August 19, 2026 (docket #450), the Court limited the Estifanos Creditors' ability to present evidence in support of the existence of asserted causes of action, holding as follows:

A debtor's release or abandonment of a claim may be approved if it satisfies the business judgment rule. *See, e.g., In re Genesis Glob. Holdco, LLC*, 660 B.R. 439, 524 (Bankr. S.D.N.Y. 2024). As the Estifanos Creditors acknowledge, "§ 1123(b)(3)(A) commits the disposition of estate causes of action to the plan proponent's business judgment, not to a single creditor's preference." *Estifanos Creditors' Supplemental Opposition to Confirmation of Amended Combined Disclosure Statement and Plan of Reorganization* (docket #448), at 6. "The business judgment rule bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes. . . . [T]he Court should not substitute its business judgment for that of the Debtor[]." *In re Genesis Glob. Holdco*, 660 B.R. at 524 (internal quotation and citations omitted).

**i. Malpractice**

The Estifanos Creditors assert Debtor has or may have a malpractice claim against counsel who represented Debtor in the State Court Lawsuit, and any such claim should be assigned to the Litigation Trust. Logically, this argument would require the Estifanos Creditors to contend the State Court Judgment entered in their favor was too high, and the amount awarded would have been lower if Debtor's counsel had acted in accordance with his duties. *See, e.g., Bebo Constr. Co. v. Mattox & O'Brien, P.C.*, 990 P.2d 78, 83 (Colo. 1999) ("[T]he [legal malpractice] plaintiff must demonstrate that the claim underlying the malpractice action should have been successful if the attorney had acted in accordance with his or her duties."). The Estifanos Creditors do not so contend.[26]

The Estifanos Creditors assert the need for access to information protected by the attorney-client privilege, in order to evaluate the merits of any malpractice claim.[27] Both Debtor and NOVA object, for good reason: prosecuting or investigating a malpractice

---

> The Court will allow the Estifanos to assert that such causes of action exist, have value, and should be transferred to the litigation trust. But, such evidence and argument must be brief. The Court will not, at this time, decide whether any such causes of action do or do not exist, and the Court will not allow the parties to present extensive evidence about whether the causes of action do or do not exist.

*Order on Motion to Restrict Use of State Trial Court Order* (docket #450) at 1. Some limits were necessary to complete the hearing within a reasonable time.

[26] The Estifanos Creditors argue a malpractice claim need not be based on how the trial was tried; instead, it could be based on counsel's failure to obtain a higher settlement offer. The Court cannot find that distinction makes a difference. To the extent counsel's failure to accomplish a settlement may constitute malpractice (which the Court does not find), the measure of damages would be based on the State Court Judgment. There is no way to pursue damages for malpractice without contending the Estifanos Creditors should have received less money. And, regardless of the specific challenge to trial counsel's efforts – in settlement or in trial – the harms of interference with Debtor's chosen counsel, disclosure of privileged information, and interference with the pendency of the State Court Appeal are the same.

[27] "The Estifanos Creditors cannot evaluate a malpractice or conflict claim while that privilege is being withheld, which is a further reason control of it should not remain with Debtor." *Estifanos Creditors' Opposition to Final Approval of Combined Disclosure Statement and Objection to Confirmation of Chapter 11 Plan; Reservation of Rights* (docket #359), at 19-20.

claim is inappropriate while the underlying matter remains pending and counsel continues to provide services.[28] Debtor views the Estifanos Creditors' argument as an improper attempt to gain an unfair advantage in the State Court Appeal. The Court need not determine whether the Estifanos Creditors are acting with improper intent. Intended or not, the effect is the same. Releasing privileged information at this time would hamstring Debtor's ability to prosecute the State Court Appeal. The Bankruptcy Code does not require it, and this Court will not require it.

The Plan does not assign any malpractice claim Debtor may have to the Litigation Trust. Any such claim would, therefore, be extinguished upon confirmation, both by the specific language in the Plan, *see* § 5.03(iii), and under applicable law, *see, e.g., In re Mako, Inc.*, 985 F.2d 1052, 1055 (10th Cir. 1993). The Court finds Debtor's decision to abandon any malpractice claim it may have falls well within the scope of acceptable business judgment. The decision was not made in bad faith or unlawfully, and it legitimately furthers the purposes of protecting the attorney-client privilege and preserving Debtor's ability to pursue the State Court Appeal. Debtor's treatment of any malpractice claim satisfies subsection (b)(3)(A).

**ii. Directors and Officers**

The Estifanos Creditors assert Debtor may have valuable claims against its directors and officers, and any such claims should be assigned to the Litigation Trust. The Court has considered the arguments of both sides in its review of Debtor's exercise of its business judgment.

Debtor is a Delaware LLC. Under Debtor's Operating Agreement (Exhibit 16), its sole member and manager is GCAP Holdco, which is also a Delaware LLC. GCAP Holdco's individual managers are not designated as managers under Debtor's Operating Agreement, nor are they parties to Debtor's Operating Agreement. Any duties with respect to management of the Debtor are owed by GCAP Holdco as an entity, not by any individual member of GCAP Holdco.

GCAP Holdco's Operating Agreement (Exhibit 15) provides it will not take responsibility for Debtor's day-to-day operations, deferring to Mr. Beckley as CEO pursuant to the Services Agreement, which was entered into in 2020 and which provided for a 30-month term. GCAP Holdco's Operating Agreement expressly waives all fiduciary duties owed by any board member in that capacity and precludes any person from asserting that a breach of such duties has occurred, which is consistent with applicable Delaware law. *See* Del. Code Ann. tit. 6, § 18-1101(c).

As to Mr. Beckley, the Services Agreement required him to perform services in substantially the same manner as he had performed prior to the date the Services Agreement became effective. Regardless of whether Mr. Beckley performed his services

[28] Mr. Maniscalco testified Debtor had retained appellate counsel but continued to need trial counsel's assistance, including its institutional knowledge.

well, it appears highly likely Mr. Beckley performed them in substantially the same manner prior to and after the date of the Services Agreement.

The language of the Debtor's Operating Agreement, GCAP Holdco's Operating Agreement, and the Services Agreement, and the law applicable to those agreements, combine to reduce the likelihood of success of any cause of action against Debtor's manager, GCAP Holdco, the board members of GCAP Holdco, or Mr. Beckley, regardless of whether such cause of action is based on breach of contract or breach of fiduciary duty. And more importantly, even if such cause of action had a likelihood of success at the time it arose, on or before September 2021, the applicable statute of limitations expired long before Debtor's bankruptcy petition was filed in February of 2026.[29]

Any breach of contract or breach of fiduciary duty claim Debtor may have against its directors and officers would be released or abandoned upon confirmation. The Court finds Debtor's decision to release or abandon any such claim falls within its business judgment. The decision was not made in bad faith or unlawfully, and it furthers legitimate corporate purposes including obtaining finality and ending the investigations that have consumed an extensive amount of the limited resources of Debtor, GCAP Holdco, and Mr. Beckley. Debtor's treatment of any breach of contract or breach of fiduciary duty claim Debtor may have against its directors and officers satisfies subsection (b)(3)(A).

**iii. Hot Springs and Off Road**

The Estifanos Creditors assert Debtor may have veil piercing or substantive consolidation claims against the Hot Springs and/or Off Road, and any such claims should be assigned to the Litigation Trust. The Court has considered the arguments of both sides in its review of Debtor's exercise of its business judgment.

The Estifanos Creditors assert Debtor, its owner (GCAP Holdco), the Hot Springs, and the owner of the Hot Springs (IMHS Holdco) have a common ownership connection (different funds, but all associated with Off Road), common board members, and shared services. Debtor, GCAP Holdco, and the Hot Springs point out each entity observed corporate formalities and maintained separate books and audited financial statements, and the shared resources were limited and defined by specific contracts such as the Commercial Lease and the Parking Lot Lease Agreement. Mr. Kramer and Mr. Reshetnev testified the Hot Springs and the Park were run separately, with different management teams, different equity investors, and different capital structures.

"Piercing the corporate veil under the alter ego theory requires showing that the corporation is a sham and exists for no other purpose than as a vehicle for fraud." *Banks v. Theodore Banks & S. Comfort, LLC*, No. 2022-0428-PWG, 2022 WL 17261512, at *5 (Del. Ch. Nov. 29, 2022) (quoting *PR Acquisitions, LLC v. Midland Funding LLC*, No. 2017-0465-TMR, 2018 WL 2041521, at *15 (Del. Ch. Apr. 30, 2018)); *see also Crosse v.*

---

[29] The Estifanos Creditors argue the statute of limitations may be extended, based on their lack of knowledge. The Court cannot agree. The statute of limitations applicable to Debtor's claims and causes of action is based on Debtor's knowledge.

*BCBSD, Inc*., 836 A.2d 492, 497 (Del. 2003) (plaintiff "must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors"); *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183-84 (Del. Ch. 1999) ("Persuading a Delaware court to disregard the corporate entity is a difficult task."). Here, the Estifanos Creditors or anyone acting on Debtor's behalf would have a particularly difficult task showing Debtor was a sham entity designed to defraud creditors. The Park operated for years before Off Road-associated entities and GCAP Holdco became involved, and Debtor's current ownership structure involving funds associated with Off Road and GCAP Holdco was established in 2020, well before the September 2021 death of the Estifanos Creditors' child.

Any veil piercing or substantive consolidation claim Debtor may have would be released or abandoned upon confirmation. The Court finds Debtor's decision to release or abandon any such claim falls within its business judgment. The decision was not made in bad faith or unlawfully, and it furthers legitimate corporate purposes including respecting corporate formalities and general rules of corporate separateness, obtaining finality, and ending time-consuming and burdensome investigations. Debtor's treatment of any veil piercing or substantive consolidation claims satisfies subsection (b)(3)(A).

**iv. Transfers to GCAP Holdco**

In the original version of its Plan, Debtor acknowledged it transferred $1,613,660 to GCAP Holdco on September 15, 2025, which was within one year of Debtor's bankruptcy filing. On October 24, 2025, GCAP Holdco returned $600,000 of that amount. GCAP Holdco did not distribute the remaining amount and (as of the original Plan filing date) held a cash balance slightly exceeding $1,000,000.

The Plan currently provides GCAP Holdco will pay all the cash it has (less a $25,000 wind-down reserve) in full satisfaction of any liability GCAP Holdco may have to Debtor. Debtor estimates the funds paid will be approximately $1,000,000, which will fund payments to be made under the Plan.

The Estifanos Creditors object to the settlement with GCAP Holdco, noting the amounts Debtor transferred to GCAP Holdco between March 29, 2022, and September 15, 2025, total $2,987,946. Because the transfers were entered on Debtor's books as distributions, they may not have been made in exchange for consideration. The Estifanos Creditors argue the transfers are avoidable as fraudulent transfers.

The Court has considered the applicable *Kopexa* factors. Debtor could assert fraudulent transfer causes of action against GCAP Holdco, seeking to recover $2,987,946 less the $600,000 returned. It is possible GCAP Holdco could assert defenses. The litigation may not be particularly complex, but attorney's fees would be significant, and the fees incurred would not only reduce the funds available for Debtor (or the Litigation Trust) to distribute to creditors but also would reduce the funds available for recovery from GCAP Holdco. GCAP Holdco's assets consist of (1) a finite amount of cash, the value

and amount of which will be reduced over time and with additional expenses, and (2) its interest in Debtor, which is being eliminated under the Plan. The longer litigation takes, the less collectible any judgment will be. Thus, the key *Kopexa* factor here is the difficulty in collecting any future judgment in Debtor's favor.

The settlement provides Debtor an opportunity to obtain approximately $1 million cash, representing substantially all of GCAP Holdco's assets, without further delay and expense – the proverbial bird in the hand.[30] In this case, there are no other birds in sight, nor is there a realistic possibility other birds will appear. The Court finds the settlement represents the highest point in the range of reasonableness. It satisfies *Kopexa* and *Kearney*. Debtor's inclusion of the settlement in the Plan complies with subsection (b)(3)(A).

**v. Equitable subordination**

The Estifanos Creditors assert Debtor may have an equitable subordination claim against the Bank, and any such claim should be assigned to the Litigation Trust. The Estifanos Creditors have not asserted any basis upon which equitable subordination would be appropriate. Even if such basis existed, on February 11, 2026, the Delaware Court entered its *Interim Order Under 11 U.S.C. §§ 105, 361, and 363; Bankruptcy Rules 2002, 4001, and 9014; and Del. Bankr. L.R. 4001-2 (I) Authorizing Debtor to Use Cash Collateral, and (II) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)* (docket #29), which established a 75-day deadline to initiate challenges against the Bank, including equitable subordination actions. No such challenge was filed, and the deadline expired April 27, 2026. Any such claim is now barred.

The Court finds Debtor's decision to abandon any equitable subordination claim it may have against the Bank falls well within the scope of acceptable business judgment. The decision was not made in bad faith or unlawfully, and it ensured the availability of cash collateral for the Park's continued operations and sale as a going concern. Debtor's treatment of any equitable subordination claim satisfies subsection (b)(3)(A).

**b. The Litigation Trust.**

Subsection (b)(3)(B) allows a debtor to retain claims, and it also allows a debtor to appoint an estate representative to pursue claims. Subsection (b)(3)(B) does not *require* the appointment of an estate representative to pursue claims, nor does it require specific terms of an appointment of the estate representative.

> [Chapter 11 of the Bankruptcy Code] does not set forth a template plan or give suggested forms of provisions. Rather, in various subsections, it requires or permits plan provisions that have certain functions, or create

[30] *See In re Dennett*, 449 B.R. 139, 146 (Bankr. D. Utah 2011) ("Although in a perfect world, the creditors should be repaid all of their claims, there comes a point when the factors of *Kopexa* dictate that 'a bird in the hand is worth two in the bush' and creditors will have to take less based on a realistic view of the situation.").

> particular obligations. So long as the mandatory provisions appear, the plan's ultimate structure, form and effect are left to the plan's proponent.

7 *Collier on Bankruptcy* ¶ 1129.01 (16th ed. rev. 2026). Here, the Bankruptcy Code does not require the Trustee of the Litigation Trust to have all the powers and privileges of a Chapter 11 Trustee. The Bankruptcy Code does not require the Litigation Trust to be funded at a certain amount. And, the Bankruptcy Code does not require the Litigation Trust to contain every claim Debtor has or may have. Debtor has assigned to the Litigation Trust the one cause of action it believed was appropriately pursued, in a valid exercise of its business judgment.

The Litigation Trust Cause of Action is defined in the Plan. It includes claims and causes of action against NOVA, which the Estifanos Creditors assert acted in bad faith in its treatment of their claim. Given the relationship between those claims and causes of action and the Estifanos Creditors, it is appropriate for those claims and causes of action to be pursued for the exclusive benefit of the Estifanos Creditors, as the Plan provides. But, the calculation would be different for different estate causes of action. Applying fundamental bankruptcy principles of equal distribution among similarly situated creditors, courts presume a party pursuing estate causes of action for its exclusive benefit does not have the authority to do so, in the absence of clear plan language to the contrary. *See In re Mako, Inc.*, 985 F.2d 1052, 1055-56 (10th Cir. 1993) (requiring clear evidence to overcome the presumption that a creditor may not bring avoidance actions for its exclusive benefit). Here, if the Litigation Trust were to contain every claim Debtor has or may have, it may not be appropriate for the Litigation Trust to benefit only the Estifanos Creditors, to the exclusion of the trade creditors in Class 3.

Specifically in this case, it would not be appropriate to assign a § 363(n) claim to the Litigation Trust. "Like avoidance actions, a § 363(n) action is administered by the trustee on behalf of the estate as a whole – as opposed to any individual creditor – and any recovery is deemed the property of the estate." *Arlington Capital LLC v. Bainton McCarthy LLC (In re GT Automation Group, Inc.)*, 534 B.R. 337 (N.D. Ind. 2015), *judgment vacated on other grounds*, 828 F.3d 602 (7th Cir. 2016) (finding plaintiff lacked standing to pursue appeal). If, in this case, the sale price were controlled by collusion among bidders,[31] giving rise to a § 363(n) cause of action, the improperly reduced sale price may have harmed all creditors and parties in interest, not just the Estifanos Creditors. And, if Debtor succeeds in the State Court Appeal, the Estifanos Creditors may not be able to show any reduced sale price affected them pecuniarily, which would deprive them or their representative of standing to pursue a § 363(n) cause of action. *See, e.g., In re GT Automation Group, Inc.*, 828 F.3d at 605 (finding no standing).

Finally, in this case, it would not be appropriate to assign any § 363(m) determination to the Litigation Trust. Section 363(m) provides protection to a good faith

[31] The Court notes the evidence before it does not support a conclusion the sales price was controlled by collusion among bidders, despite the ample opportunity the Estifanos Creditors had to investigate that possibility, which was much more than that typically provided to creditors in a § 363 or Chapter 11 plan asset sale.

purchaser. It does not establish a cause of action a debtor can maintain or assign under subsection (b)(3)(B). Whether a purchaser is entitled to a good faith finding under § 363(m) should be determined by a court based on the evidence before it at the time of the sale. *See In re Lotspeich*, 328 B.R. 209, 218 (10th Cir. BAP 2005) (citing *In re Abbotts Dairies of Pa. Inc.*, 788 F.2d 143 (3d Cir. 1986)). Here, the Plan states, and the Asset Purchase Agreement requires as a condition of closing, that the Court make § 363(m) findings.[32] If this Court were unable to make such findings, based on the evidence before it, the Purchaser would be excused from its obligation to proceed to closing, which is fundamentally fair. If that were not the case, purchasers would be much less willing to purchase assets from a bankruptcy estate.

For the reasons discussed above, the Court finds the Litigation Trust satisfies subsection (b)(3)(B).

**4. § 1123(c) and (d).**

Subsection (c) applies to individual debtors and is not applicable here. Subsection (d) provides for cure amounts, which are undisputed here. The Plan satisfies every applicable subsection of § 1123.

Because the Plan satisfies § 1122 and § 1123, the Plan satisfies § 1129(a)(1).

**C. § 1129(a)(2).**

To satisfy § 1129(a)(2), Debtor must prove it complied with applicable provisions of the Bankruptcy Code, with a focus on the provisions set forth in §§ 1125 and 1126. See Bankruptcy Reform Act of 1978, S. Rep. No. 95-989, at 132 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5912 ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure"); *see also In re John Kuhni & Sons, Inc.*, No. 10-29038, 2011 WL 1343206, at *2 (Bankr. D. Utah Mar. 30, 2011) (discussing compliance with disclosure and solicitation requirements).

Here, Debtor complied with all solicitation and disclosure requirements set forth in the Bankruptcy Code. By Order entered July 7, 2026 (docket #302), the Court confirmed its conditional approval of the adequacy of information contained in the combined Plan and Disclosure Statement (docket #242). Debtor, through Epiq, transmitted solicitation packages on July 10, 2026, in accordance with the Court's orders, as shown by the certificate of service filed by Epiq on July 15, 2026 (docket #319).

Debtor has complied with applicable provisions of the Bankruptcy Code. Section 1129(a)(2) is satisfied.

[32] The Court's findings on the Purchaser's good faith under § 363(m) are set forth below.

### D. § 1129(a)(3).

To satisfy § 1129(a)(3), Debtor must prove the Plan has been proposed in good faith and not by any means forbidden by law. Good faith has been described as follows:

> Thus, for purposes of determining good faith under section 1129(a)(3), . . . the important point of inquiry is the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code. The district court's decision failed to make this legal distinction between the good faith that is required to *confirm a plan* under section 1129(a)(3) and the good faith that has been established as a *prerequisite to filing* a Chapter 11 petition for reorganization.
>
> According to the good faith requirement of section 1129(a)(3), the court looks to the debtor's plan and determines, in light of the particular facts and circumstances, whether the plan will fairly achieve a result consistent with the Bankruptcy Code. The plan "must be 'viewed in light of the totality of the circumstances surrounding confection' of the plan [and] ... [t]he bankruptcy judge is in the best position to assess the good faith of the parties' proposals."

*In re Madison Hotel Assocs*., 749 F.2d 410, 425 (7th Cir. 1984) (citations omitted) (quoting *In re Jasik*, 727 F.2d 1379, 1383 (5th Cir. 1984) (further quotation omitted); 7 *Collier on Bankruptcy* ¶ 1129.02 (16th ed. rev. 2026) ("Few cases since *Madison Hotel Associates* have managed to add anything substantive to this description, and many courts have used these words and phrases more or less verbatim.") (footnotes omitted).

In determining whether Debtor has sufficiently established good faith, the Court does not look to Debtor's prepetition conduct, including its responsibility for the death of the Estifanos Creditors' child, nor does it look to whether Debtor filed its Chapter 11 petition in good faith. Instead, the Court's focus is on the Plan itself, and whether the Plan is likely to achieve a result consistent with the Bankruptcy Code. The Court finds it is.

The Plan provides for the sale of substantially all of the Debtor's assets as a going concern, which maximizes the value of the assets,[33] and the Plan distributes the sale proceeds according to the priorities of the Bankruptcy Code. The Plan provides for the payment of the Bank's secured claim and allows the Park to continue its operations, providing employment for up to 250 people, maintaining a customer for its trade vendors (and providing some payment to those vendors), and preserving a recreation asset for the community. Had the Bank been allowed to foreclose its security interest, Debtor's unsecured creditors, including the Estifanos Creditors, would likely have received little to

---

[33] The Estifanos Creditors argue the ultimate sale price was too low. As discussed above, the assets were adequately marketed, the sale process was fair, and the price reflected a fair market value of the assets as a going concern. The parties complied with the bidding and sale procedures approved by this Court. The Plan put a process in place designed to reach the highest price within a reasonable time. This supports a finding of good faith.

no distribution of Debtor's assets. Under the Plan, the Estifanos Creditors do receive a significant distribution, including an estimated $5 million in proceeds from the sale, plus any recovery from the Litigation Trust, plus insurance funds.

The Estifanos Creditors argue Mr. Beckley's involvement on both sides of the asset sale precludes a finding of good faith. But, Mr. Beckley did not control either side. On the Debtor's side, Debtor's sole member and manager, GCAP Holdco, is governed by a five-member board of managers. Mr. Beckley is one of those board members and is an indirect minority owner (17.5%). But, Mr. Beckley recused himself during any discussion of the sale or the sale process. On the Purchaser's side, GVC's Managing Director, Mr. Nocas, testified he was the one making the decisions, including the decision to bid for the Park, not Mr. Beckley, who was a 20% minority shareholder. The sale process was managed by Hilco, an independent company that marketed the Park, solicited bids, provided information to prospective bidders, and reviewed bids to ensure they met the qualifications approved by the Court. Debtor selected Glenwood Mountain, an entity not connected to Mr. Beckley, as the Stalking Horse Bidder. GVC, acting through Mr. Nocas, was selected as the winning bidder after thirteen rounds of bidding in an open auction witnessed by counsel for the Estifanos Creditors and a representative of the Bank. This is the opposite of a backroom deal improperly controlled by Mr. Beckley.

The Court finds Mr. Beckley did not act inappropriately in pursuing his goal of remaining involved with the Park, which he founded and which has been his "lifelong dream." Mr. Beckley held back as directed by GCAP Holdco's board, which acted independently of Mr. Beckley and on the advice of counsel. Mr. Beckley's participation in the sale process was the same as that of any other bidder or potential bidder. He did not take any action that reduced the value of the Debtor's assets or the price obtained at auction. He did not participate in a scheme to file the bankruptcy case for the purpose of defeating the Estifanos Creditors' claims. He did not want the bankruptcy case to be filed. His interests in the Debtor's ownership and his rights to receive payment from GCAP Holdco are being eliminated under the Plan. GCAP Holdco and its owners' interests are also being eliminated under the Plan. The Court does not believe the parties conspired to cut off their own noses to spite the face of the Estifanos Creditors. The Court finds Mr. Beckley's actions and involvement in the sale are consistent with a finding of good faith.

The Estifanos Creditors would prefer that the Plan contain different provisions. But, as discussed above, the Plan's provisions satisfy applicable requirements of the Bankruptcy Code. The Court specifically finds the Plan's release provisions are permissible and do not weigh against a finding of good faith. The Court further finds the Plan's classification of claims and designations of impairment are accurate and made in good faith.[34] Good faith does not require a plan proponent to include other parties' preferred provisions in its plan. "A debtor's plan may satisfy the good faith requirement even though the plan may not be one which the creditors would themselves design . . . ." *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 802 (5th Cir. 1997).

[34] The Court will discuss below the Estifanos Creditors' argument that Class 1 is not impaired.

The Court finds the Plan was proposed in good faith and not by any means forbidden by law. Section 1129(a)(3) is satisfied.

**E. § 1129(a)(4).**

To satisfy § 1129(a)(4), Debtor must prove all payments for services, costs, and expenses in connection with the case or the Plan have been approved by this Court or are subject to the approval of this Court. The section requires this Court to "exercise substantive control over fees and costs related to confirmation and the chapter 11 case." 7 *Collier on Bankruptcy* ¶ 1129.02 (16th ed. rev. 2026).

No party disputes the Court will review all payments for services, costs, and expenses for reasonableness. Section 1129(a)(4) is satisfied.

**F. § 1129(a)(5).**

To satisfy § 1129(a)(5), Debtor must prove the Plan discloses the identity and affiliations of any individual who will serve as a director or officer of the Debtor. The Plan provides Mr. Maniscalco, Debtor's current Chief Restructuring Officer, will become the Chief Wind-Down Officer and will be paid $650 per hour, subject to a cap of $15,000 per calendar month.

No party disputes Debtor has made adequate disclosure, and the employment of Mr. Maniscalco is consistent with the interests of creditors and with public policy. Section 1129(a)(5) is satisfied.

**G. § 1129(a)(6).**

Section 1129(a)(6) does not apply. Debtor is not a regulated utility.

**H. § 1129(a)(7).**

To satisfy § 1129(a)(7), Debtor must prove the Plan provides distribution to creditors that equals or exceeds the amount those creditors would receive in a Chapter 7 liquidation, described as follows:

> Section 1129(a)(7) is one of the cornerstones of chapter 11 practice. It is an individual guaranty to each creditor or interest holder that it will receive at least as much in reorganization as it would in liquidation. With this guaranty in place, the Code assumes that any value over and above liquidation value is subject to negotiation and debate, and its allocation subject to group vote rather than individual demand.

7 *Collier on Bankruptcy* ¶ 1129.02 (16th ed. rev. 2026). While § 1129(a)(7) is referred to as the "best interests of creditors test," it does not require the plan be in the best interest

of any one creditor or any one class of creditors. A plan that provides a creditor what it would receive under Chapter 7 satisfies § 1129(a)(7) regardless of whether a creditor could receive more if the plan terms were different.

Here, in a Chapter 7 liquidation, the Estifanos Creditors would receive much less than under the Plan. Mr. Maniscalco testified that under the Plan, using the sale numbers after the auction, the Estifanos Creditors would receive approximately $5 to $5.2 million. But in a Chapter 7 case, as shown in his liquidation analysis, the Estifanos Creditors would receive their share of $1,244,000.[35] As discussed above, the actual liquidation value may be much lower, and unsecured creditors may receive nothing. A Chapter 7 Trustee would be able to pursue Debtor's litigation claims, although it is not clear those claims have a high likelihood of success and it is not clear how the pursuit of those claims would be funded, with Debtor's available cash subject to the Bank's security interest. If the Chapter 7 Trustee declined to pursue the State Court Appeal, that might be in the best interest of the Estifanos Creditors, but it might not be in the best interest of trade creditors in Class 3, to the extent any assets are available for distribution to unsecured creditors. A Chapter 11 plan is allowed to take into account the interests of different constituencies, and it is entitled to pursue the goal of preserving an ongoing business for the benefit of employees, vendors, and the public, as long as it provides creditors a certain minimum distribution. Here, the Plan provides the Estifanos Creditors much more than the minimum.

Because the Plan provides the Estifanos Creditors a greater recovery than they would receive in a Chapter 7 liquidation, § 1129(a)(7) is satisfied.

### I. § 1129(a)(8).

Section 1129(a)(8) requires each class of claims or interest either accept the Plan or be unimpaired under the Plan. Here, Class 2 voted to reject the Plan, and Class 4 is deemed to reject the Plan. Section 1129(a)(8) is not satisfied. But, Debtor may be able to obtain confirmation under § 1129(b), as discussed below.

### J. § 1129(a)(9).

Section 1129(a)(9) sets forth requirements for claims entitled to priority in Chapter 11 cases, including administrative expense claims, priority nontax claims, and priority tax claims. The Plan's treatment of such creditors is set forth in § 4.02(i)-(iii). Section 1129(a)(9) is satisfied.

### K. § 1129(a)(10).

To satisfy § 1129(a)(10), Debtor must prove at least one impaired class of claims has accepted the Plan. Here, Class 1 and Class 3 accepted the Plan (Exhibit 4).

---

[35] In a Chapter 7 case, the punitive damages portion of the Estifanos Creditors' claim would be subordinated below the claims of general unsecured creditors, *see* § 726(a)(4), so their recovery could be further reduced.

The Estifanos Creditors argue Class 1, the secured claim of the Bank, is not impaired. Impairment is defined as follows:

> In general, a class of claims is impaired under section 1124 if the plan alters the legal, equitable or contractual rights to which the holders of such claims are otherwise entitled, unless the only alteration is the reinstatement of the original maturity and curing defaults with respect to an accelerated debt.

7 *Collier on Bankruptcy* ¶ 1124.02 (16th ed. rev. 2026). Here, the Plan alters the legal, equitable, and contractual rights of the Bank. The Plan provides for the assumption of the debt by the Purchaser. It provides for interest-only payments for a one-year period, at a non-default interest rate. It provides for re-amortization and changes the payment dates beyond their original terms. The Estifanos Creditors dismiss those provisions as mere "shifts in timing." The Court cannot agree. Payment and maturity dates are significant for banks, as are interest rates, and it is well established that changes to those terms constitute impairment. *See In re S-Tek 1, LLC*, No. 20-12241-J11, 2021 WL 5858906, at *3 (Bankr. D.N.M. Dec. 9, 2021) ([C]hanging the contractual interest rate, making deferred payments on terms different from the original contract, or stretching payment beyond the maturity of its original contract, all constitute impairment of the claim. A claim can also be impaired by changing noneconomic contract terms.") (citing cases, footnotes omitted); *see also In re Brewery Park Assocs., L.P.*, No. BR 10-11555, 2011 WL 1980289, at *9 (Bankr. E.D. Pa. Apr. 29, 2011); *In re G.L. Bryan Invs., Inc.*, 340 B.R. 386, 390 (Bankr. D. Colo. 2006).

To the extent the Estifanos Creditors argue the Bank's impairment is artificial, the Court also disagrees.

> Artificial impairment occurs when the plan proponent "causes the class to be impaired without an economic justification for doing so, for the apparent purpose of obtaining the required vote" of an impaired class. *In re Deming Hospitality, LLC*, 2013 WL 1397458 at *2 (Bankr. D.N.M., Apr. 5, 2013). Artificial impairment has generally been held to violate Sections 1129(a)(10) or 1129(a)(3). *Id.* Regardless of the Bankruptcy Code section, the practice is condemned.

*In re Autterson*, 547 B.R. 372, 396 (Bankr. D. Colo. 2016). Here, the economic justification for making interest-only payments during the first year and re-amortizing the loans is obvious: monthly payments are reduced, and cash flow is improved, providing an important benefit and helping ensure the Park's continued operations. And, as discussed above, the Court finds the Plan's classification and proposed treatment of claims to have been made in good faith.

Finally, Class 3 is impaired and accepted the Plan. As discussed above, the Court finds Debtor's separate classification of Class 3 to be permissible under the Bankruptcy Code and to have been made in good faith.

Because Class 1 and Class 3 are impaired classes that voted to accept the Plan, § 1129(a)(10) is satisfied.

**L. § 1129(a)(11).**

To satisfy § 1129(a)(11), Debtor must prove the Plan is feasible, which requires a showing the Plan "offers a reasonable prospect of success and is workable." *In re Gentry*, 807 F.3d 1222, 1226 (10th Cir. 2015) (quoting *In re Inv. Co. of The Sw., Inc.*, 341 B.R. 298, 311 (10th Cir. BAP 2006)). Feasibility does not require a guarantee of success. *Id.*

Here, the Purchaser (GVC) demonstrated its ability to close to the satisfaction of Hilco and the Debtor, provided a $1.3 million deposit, and provided testimony it is ready, willing, and able to close on the sale transaction. The sale will satisfy the Bank's secured claim and will provide funds to be distributed to unsecured creditors as set forth in the Plan. As to the sale, the Debtor has met its burden of proving the Plan offers a reasonable prospect of success and is workable.

As to other aspects of the Plan, GCAP Holdco will pay Debtor all the cash it has (less a $25,000 wind-down reserve), which Debtor estimates will be $1 million. The cash from GCAP Holdco, combined with net sale proceeds and Debtor's available cash, will be sufficient to fund the Litigation Trust at $100,000, to pay administrative expenses including attorney's fees incurred in connection with the State Court Appeal and any claim objections, to compensate Mr. Maniscalco, and to wind down and dissolve the Debtor. The Court specifically finds the Litigation Trust is adequately funded at $100,000.

Debtor has sufficiently established feasibility. The Plan satisfies § 1129(a)(11).

**M. § 1129(a)(12).**

To satisfy § 1129(a)(12), Debtor must prove the Plan provides for the payment of U.S. Trustee fees. The Plan so provides, in §§ 4.02(iii) and 10.07. By including the U.S. Trustee fee payment in the administrative expense priority section and in a separate section, the Plan is consistent with the duplication existing in § 1129. *See* 7 *Collier on Bankruptcy* ¶ 1129.02 (16th ed. rev. 2026) (criticizing § 1129(a)(12) as "unnecessary" because the fees are entitled to administrative expense priority under § 507(a)(2) and therefore must be paid under § 1129(a)(9)). The Plan satisfies § 1129(a)(12).

**N. § 1129(a)(13)-(16).**

Debtor does not pay retiree benefits, so § 1129(a)(13) is inapplicable. Debtor does not have domestic support obligations, so § 1129(a)(14) is inapplicable. Debtor is not an individual, so § 1129(a)(15) is inapplicable. And finally, Debtor is an LLC and is not a nonprofit, so § 1129(a)(16) is inapplicable.

The Court finds all applicable sections of § 1129(a) other than § 1129(a)(8) have been satisfied. The Court thus turns to § 1129(b).

### O. § 1129(b).

The Bankruptcy Code anticipates that Chapter 11 plans may not obtain the consent of all participants. If an impaired class does not accept its treatment under a plan, the plan may nevertheless be confirmed, as long as the plan does not discriminate unfairly, and is fair and equitable, with respect to each impaired, non-accepting class. The Court will discuss each requirement in turn.

#### 1. Discrimination.

The Bankruptcy Code allows for discrimination in Chapter 11 plans, provided the discrimination is not unfair. *Collier* explains the rationale of this section as follows:

> Before reaching any issues of unfair discrimination, a court will have to have made affirmative findings on all other confirmation requirements. This means that, among other things, the court will have found that classification of the dissenting class is proper, and the dissenting class will receive at least its liquidation preference. All that is at issue is the "unfair" division of the reorganization surplus, that amount of value in excess of liquidation value.
>
> By including the "unfair discrimination" test, Congress made it clear that such a reorganization surplus did not have to be allocated to creditors on the basis of liquidation preferences. There can be "discrimination," so long as it is not "unfair." This makes some practical sense: unsecured creditors under nonbankruptcy law include such diverse entities as tort claimants, trade creditors, bondholders and possibly nontax governmental claims. On liquidation, all of these claimants share *pro rata*. To hold, however, that all such creditors should share proportionately in the reorganization surplus, when each group does not contribute proportionately to its creation and maintenance, makes little sense.

7 *Collier on Bankruptcy* ¶ 1129.03 (16th ed. rev. 2026). *Collier* then states the test as follows: "The test thus boils down to whether the proposed discrimination has a reasonable basis and is necessary for reorganization." *Id.* (citing *In re 203 North LaSalle Street Ltd. P'ship*, 190 B.R. 567, 585-86 (Bankr. N.D. Ill. 1995), *aff'd*, 195 B.R. 692 (N.D. Ill. 1996), *aff'd*, 126 F.3d 955 (7th Cir. 1997), *rev'd on other grounds*, 526 U.S. 434, 119 S. Ct. 1411, 143 L. Ed. 2d 607, 41 C.B.C.2d 526 (1999) ("First, any discrimination must be supported … by a legally acceptable rationale … . Second, the extent of the discrimination must be necessary in light of the rationale.")).

The Court also considers the factors set forth in *In re Tribune Co.*, 972 F.3d 228 (3d Cir. 2020):

> A rebuttable presumption of unfair discrimination exists when there is (1) a dissenting class; (2) another class of the same priority; and (3) a difference in the plan's treatment of the two classes that results in either (a) a materially lower percentage recovery for the dissenting class (measured in terms of the net present value of all payments), or (b) regardless of percentage recovery, an allocation under the plan of materially greater risk to the dissenting class in connection with its proposed distribution.

*Id.* at 241 & n.16 (quoting and adopting the analysis of Bruce A. Markell, *A New Perspective on Unfair Discrimination in Chapter 11*, 72 Am. Bankr. L.J. 227, 249 (1998)). In considering whether the Plan contains unfair discrimination, the Court looks to "what the discrimination does, and not why the discrimination was inserted in the first place." 7 *Collier on Bankruptcy* ¶ 1129.03 (16th ed. rev. 2026). Thus, the Court's determination does not involve an examination of Debtor's motives or good faith.[36]

Here, the Plan does discriminate between Class 2 and Class 3, but that discrimination is not unfair. The Class 2 claim is a tort claim, while Class 3 claims are trade creditors' claims. The Class 2 claim is disputed and may take years to resolve. Class 3 claims are not disputed and are relatively small, and their 10% share can be paid quickly. It is not unfair to pay the different classes of claims differently. In fact, it would be unfair for the trade creditors, who helped contribute to Debtor's earnings, to have to wait until the tort claim is finally determined before they receive any payment on their claims. And, it would be inappropriate for Class 2 to be paid before its claim is finally determined, otherwise Class 2 may be overpaid, which is contrary to the Bankruptcy Code and basic fairness. The Court finds the discrimination is supported by a legally acceptable rationale, and the extent of the discrimination is necessary in light of the rationale.

Further, the Court cannot find the different treatment results in a materially lower percentage recovery for Class 2. Class 3 claimants will receive a payment of 10%. Class 2 will receive a payment of the Net Sale Proceeds, plus insurance, plus any recovery from the Litigation Trust. When the Plan was originally filed, Debtor estimated Class 2's recovery would be approximately $11,394,000 ($4,394,000 in Net Sale Proceeds plus $7 million in insurance), plus any recovery from the Litigation Trust, constituting at least 9.5% of its claim, the amount of which remains disputed. At the Confirmation Hearing, after the auction results, Mr. Maniscalco estimated Class 2's recovery would be approximately $12,000,000 to $12,200,000 ($5 to $5.2 million in Net Sale Proceeds plus $7 million in insurance), plus any recovery from the Litigation Trust. The estimated minimum amount to be distributed to Class 2 is very close to 10% of the Class 2 claim, the amount of which remains disputed. The difference is not material, for confirmation purposes. Finally, the Plan does not expose Class 2 to a higher risk. The anticipated 10% distribution is independent of any recovery from the Litigation Trust.

---

[36] As discussed above, the Court finds Debtor, its principals, and its insiders have acted in good faith.

For the reasons discussed above, the Court finds the Plan satisfies the requirement that any discrimination not be unfair.

### 2. Fair and Equitable.

As *Collier* explains: "'fair and equitable' can be seen to have at least two key components: the absolute priority rule; and the rule that no creditor be paid more than it is owed." 7 *Collier on Bankruptc*y ¶ 1129.03 (16th ed. rev. 2026). The Court will discuss each in turn.

#### a. Absolute Priority Rule

"[T]he absolute priority rule 'provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan.'" *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 202, (1988) (quoting the Court of Appeals holding, which further explained: "Alternatively, the plan may provide any treatment for the class of unsecured creditors, including no participation at all, as long as no junior claims or interests participate in the plan or retain an interest in the debtor's property." *In re Ahlers*, 794 F.2d 388, 401 (8th Cir. 1986), *rev'd*, 485 U.S. 197 (1988)).

The Estifanos Creditors argue the Plan violates the absolute priority rule because Debtor retains the claims and causes of action that are not assigned to the Litigation Trust. That is incorrect. All Debtor's claims not assigned to the Litigation Trust are settled, released or extinguished upon confirmation. The Plan clearly provides: "For the avoidance of doubt, any Cause of Action not transferred to the Litigation Trust shall be extinguished and not preserved." Plan § 5.03(iii). No claims remain as property of Debtor's estate.

To the extent Debtor retains funds and does not need those funds for the expenses set forth in the Plan, those funds are to be distributed first to the Litigation Trust and then, only if all unsecured claims are paid in full, to equity holders, as follows:

- "To the extent that the Debtor has any excess funds after completion of all Plan requirements and dissolution, and payment of expenses and taxes related thereto, the Debtor shall pay them to the Litigation Trust." Plan § 5.04.

- "The equity interest held by GCAP Holdco shall be cancelled and the holder of the interest shall receive no distribution under the Plan unless all Allowed Claims have been paid in full pursuant to the terms of the Plan." Plan § 4.07.

The Plan complies with the absolute priority rule.

### b. Overpayment

As noted above, if the Estifanos Creditors were to receive payment before the amount of their claim was finally determined, there is a risk of overpayment, which would violate the absolute priority rule. This further supports the Plan's treatment of the Estifanos Creditors' claim.

For the reasons discussed above, the Court finds the Plan satisfies the requirement that the treatment of the Estifanos Creditors' claim is fair and equitable.

In conclusion, the Plan satisfies each element of § 1129(b) and may be confirmed. The Court will confirm the Plan by separate order.

## VII. § 363(m)

As discussed above, the Court finds it inappropriate to assign any § 363(m) rights to the Litigation Trust and also finds it improper to delay issuing findings regarding § 363(m), which are a required condition of closing of the Asset Purchase Agreement.

Considering all the evidence before the Court, the Court hereby finds the Purchaser (GVC) is a "good faith purchaser" within the meaning of § 363(m). The Estifanos Creditors were provided a great deal of latitude and were able to complete a substantial amount of discovery, including taking a deposition of the Purchaser's principal. Despite all their efforts, the Estifanos Creditors were unable to produce any evidence supporting their theories of fraud or collusion. In contrast, the Court had plenty of evidence before it to support a determination as to the Purchaser's good faith.

The Estifanos Creditors argue the Court cannot find the Purchaser acted in good faith unless the Purchaser paid at least 75% of the appraised value of the assets. That may be a helpful guide when a court and the parties have accepted the accuracy of an appraisal's valuation. But, that is not the case here. As discussed above, the Court does not find Mr. Loch's Appraisal or funds associated with Off Road's purchase price provides an accurate valuation of Debtor's assets today. Instead, the price obtained at auction is the value of Debtor's assets as a going concern. Because the Purchaser will pay this amount, any payment component of § 363(m) is satisfied.

The Court finds the Purchaser has not entered into or attempted to enter into any agreement with potential bidders to control the price of the assets sold, before or after the sale. The Court further finds the Purchaser has not engaged in any conduct that would cause or permit the sale to be avoided through some kind of collusive control of the process. No motion seeking relief under § 363(n) is currently before the Court, but at this time the Court finds no evidence supports such relief.

## XIV. CONCLUSION

For the reasons set forth above, the Court will confirm the Plan by separate order.

Dated: September 29, 2026.

BY THE COURT:

Kimberley H. Tyson
United States Bankruptcy Judge